FILED
United States Court of Appeals
Tenth Circuit

November 3, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

KEVIN L. HINSON,

    Defendant-Appellant.

No. 08-3086

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:07-CR-10076-JTM-1)**

---

Roger Falk of Law Office of Roger L. Falk & Associates, Wichita, Kansas
(Melanie S. Morgan of Morgan Pilate LLC, Olathe, Kansas, with him on the
brief) for Defendant-Appellant.

James Brown, Assistant United States Attorney, Wichita, Kansas (Marietta
Parker, Acting United States Attorney, Wichita, Kansas, and Brent I. Anderson,
Assistant United States Attorney, Wichita, Kansas, on the brief) for Plaintiff-
Appellee.

---

Before **LUCERO, EBEL,** and **TYMKOVICH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    Defendant-Appellant Kevin Hinson challenges his conviction and sentence

for four counts of methamphetamine distribution-related offenses. Hinson argues

that the district court committed plain error by admitting evidence discovered during a search of his automobile, by allowing a police detective to introduce hearsay testimony, by admonishing the defendant that he was under oath while he was testifying, and by wrongly calculating the amount of drugs to attribute to Hinson for sentencing purposes.

We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and AFFIRM the judgment and sentence of the district court.

## I.    Background

This case began in the course of an investigation of Mac Pingry, a suspected drug dealer.  In connection with that investigation, the police executed a search warrant on Pingry's residence in November 2005.  At his residence, they discovered 27.88 grams of methamphetamine, two pounds of regular marijuana, and a quarter pound of high-grade marijuana (referred to in the record as "killer bud").  After being taken into custody, Pingry told the police that he had obtained the methamphetamine and the two pounds of regular marijuana from Mr. Hinson.  In an attempt to improve his predicament, he also told them that he would be willing to assist them in conducting a controlled buy.  A few days later, the police arranged for Mac Pingry to conduct a controlled buy from Mr. Hinson.

A.    The Controlled Buy

On the day of the controlled buy, Pingry called Hinson and asked him "just for one," which, in the code they had developed over months of working together,

signaled to Hinson that Pingry wanted a quarter pound of "ice," or high-grade

methamphetamine.[1]  The police gave Pingry $3,250, which was the standard

amount he paid for a quarter pound.  Pingry and his car were thoroughly searched

to ensure there were no other drugs or money present, and both his car and his

person were wired with surveillance equipment.  After ensuring that Pingry had

no drugs on his person or in his car, or any money other than the $3,250 given to

him by the police for purposes of the controlled buy, the police escorted Pingry to

his car.  The police then watched Pingry drive to the auto parts store where he had

arranged to meet Hinson.  Pingry did not make any stops or meet with anyone

between the time he left the police station and the time he arrived at the auto parts

store for his meeting with Hinson.

Upon arriving at the auto parts store, Pingry exited his car, opened the

trunk, and acted as though he were looking for something inside.  Mr. Hinson

then pulled up next to Pingry in a white pickup truck.  Pingry got into Hinson's

truck and, while in the truck, his wire picked up a discussion between Pingry and

Hinson regarding the quality of the drugs he was buying.  After Pingry returned to

his car, he was under continual surveillance.  He did not make any stops or

encounter anyone else before he returned to a pre-arranged meeting spot.  He

---

[1]Hinson admits to having that conversation with Pingry, but testified that "just one" referred to one ounce of "killer bud."  That testimony was implausible, however, because immediately after Pingry conducted the controlled buy, he was searched and found to be in possession of a quarter pound of methamphetamine but no marijuana.

could not, therefore, have received any drugs from anyone other than Mr. Hinson. When he arrived at the pre-arranged meeting spot, the police entered Pingry's car, where they discovered a quarter pound of methamphetamine. They subsequently drove to the police station, where Pingry and his car were thoroughly searched again. The police found no other drugs on him, and the buy money they had provided was gone.

B.    The Police Arrest and Indict Mr. Hinson

Apparently hoping to investigate further, the police did not immediately arrest Hinson. About a month later, they sought to have Pingry conduct another controlled buy from Hinson, but Pingry refused to participate. Realizing that they would be unable to convince Pingry to conduct additional buys, the police resolved to arrest Hinson. Choosing to forgo the "burden" of obtaining a search warrant for Hinson, the police decided they would simply follow his car until he committed a traffic offense and then arrest him. One officer testified that his instructions were to observe Mr. Hinson and "if we observed a traffic violation where we can stop him to make contact with him and to arrest him on the prior buy." (Appx. at 331.) That officer further testified that the reason the police did not just go ahead and arrest Hinson on the basis of the earlier controlled buy, and instead waited for him to commit a traffic violation, was that the police were not sure they had properly identified Hinson. Therefore, they waited until the person they thought was Mr. Hinson committed a traffic violation before stopping him.

A number of police officers were involved in following Hinson as he drove from his house on December 14, 2005. The arresting officer, Officer Dickerson, did not observe any traffic violations. At some point, however, Officer Dickerson was told that other officers had observed Hinson commit traffic violations and that he should be pulled over. Officer Dickerson pulled him over, and was soon joined by a number of other officers. After ensuring that the driver he had stopped was Mr. Hinson, Dickerson patted him down, cuffed him, and turned him over to another officer who transported him downtown. Dickerson informed the other officers at the scene that, as he was pulling Hinson over, Hinson had dropped some sort of cloth in the back seat.

The other officers then used a canine to sniff the perimeter of the truck. Out of concern for the officers' safety, however, the police decided not to conduct a full search of the vehicle on the side of the road. Instead, they drove the truck back to the station where they conducted a thorough search. They did not find any drugs, but they did find a jacket covering a shoebox with almost $40,000 in cash (in addition to a little over $3000 that Officer Dickerson found on Hinson's person).

For a reason that is not clear in the record, the police waited another year and a half before seeking an indictment for these crimes. Hinson was eventually indicted under four counts: one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), one count of possessing

- 5 -

with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, one count of distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of using telephones in facilitating the knowing and intentional distribution of methamphetamine in violation of 21 U.S.C. § 843(b).

C.    The Trial

At trial, the government introduced substantial evidence indicating that Hinson was Pingry's drug supplier.  Pingry testified that, beginning in the spring of 2004, he began buying anywhere from a quarter pound to a pound of methamphetamine from Mr. Hinson about 2 or 3 times a week.  Overall, he said he purchased "quite a bit more than ten pounds" from Hinson.  (Appx. at 144.) His testimony was corroborated by the large number of calls between Pingry and Hinson during this time period, and the large number of calls between Hinson and "Oscar," Hinson's alleged supplier.  This testimony was also corroborated with evidence that the IRS had almost no record of any income for Hinson, yet he was able to buy something for $17,410 in cash from Mid-America Auto Auction in 2004, and was carrying over $40,000 in cash at the time of his arrest.  In addition, Detective Hamilton testified that she began investigating the defendant after hearing, from a different confidential informant, that someone with "the name of Kevin, white male, supplied Mac Pingry with methamphetamine ice."  (App. at 226.)

Hinson admitted at trial that he was a drug dealer, but claimed that he only sold marijuana, not methamphetamine. He claimed that he worked with Oscar in selling cars, not drugs. He attempted to explain his lack of reported income and the large amount of cash he carried the day of his arrest by stating that he conducted under-the-table, cash-intensive businesses such as building dune buggies and buying and selling used cars and jewelry. He stated that, on the day of his arrest, he was carrying over $40,000 in cash because he was on his way to a car auction.

The jury found Hinson guilty of all four counts. With regards to the two charges of distribution of methamphetamine, the jury was asked to determine the amount of drugs Hinson had distributed. For count 2, the jury found that Hinson had sold 40.96 grams of a mixture containing methamphetamine, which amounted to 28.01 grams of pure methamphetamine. On count 4, the jury found that Hinson had sold 112.24 grams of a mixture containing methamphetamine, or 66.93 grams of pure methamphetamine. With regards to count 1, which charged Hinson with conspiring to distribute "at least ten (10) pounds" of a mixture containing methamphetamine (Appx. at 608), the jury was not asked to specify the actual amount Hinson was guilty of conspiring to distribute.

D.    The Sentence

At sentencing, neither party objected to the PSR, but the defendant sought a reduction in the PSR's calculation of his criminal history category and a sentence

below the guidelines range. The district court agreed with the defendant's argument that his criminal history was over-represented, and reduced his criminal history category from VI to III. The court adopted the PSR's calculation of an offense level of 36. This calculation was based on the jury's finding that Hinson had distributed 153 grams of methamphetamine and had conspired in the distribution of at least 10 pounds (or 4.54 kilograms) more. Additionally, the PSR converted the $43,148 in cash found in Hinson's car on the day of his arrest into an additional 1.5 kilograms of methamphetamine. The total amount of methamphetamine attributed to Hinson was, therefore, more than 5 kilograms, which corresponds with an offense level of 36. See U.S.S.G. § 2D1.1. Hinson's guidelines range was 235-293 months; the court sentenced him to concurrent terms of 240 months on counts 1, 2, and 4, and a concurrent term of 48 months on count 3.

## II. Analysis

A.   Plain Error Review

Hinson did not raise at trial any of the issues addressed on appeal, so we review his appeal for plain error. See United States v. Schene, 543 F.3d 627, 640 (10th Cir. 2008) (reviewing evidentiary challenge "for plain error because [the defendant] raised no contemporaneous objection"); see also United States v. Olano, 507 U.S. 725, 731 (1993) (stating that Fed. R. Crim. P. 52(b) "provides a court of appeals a limited power to correct errors that were forfeited because not

timely raised in district court"). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1222 (10th Cir. 2008).

B.    The District Court Did Not Plainly Err by Admitting the Evidence Found in Hinson's Automobile

The district court did not err in admitting the evidence found in Hinson's car because the police had probable cause to arrest Hinson for his drug trafficking activity, and their search of his car incident to that arrest was justified because they had reason to think they would find evidence of that offense in his car. Further, even if the district court erred by admitting the fruits of this search, that error is not "plain" because—in light of the substantial evidence of Hinson's drug trafficking activity presented at trial—Hinson has failed to show that "but for the error claimed, the result of the proceeding would have been different." United States v. Portillo-Vega, 478 F.3d 1194, 1202 (10th Cir. 2007).

1.    *The Police Officers Had Probable Cause to Arrest Hinson*

The police officers had probable cause to arrest Hinson based on the controlled buy they witnessed a month before his arrest as well as Pingry's statements to the police that he regularly purchased drugs from Hinson. See United States v. Turner, 553 F.3d 1337, 1344 (10th Cir. 2009) ("'[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is

probable cause to believe that a criminal offense has been or is being committed.'") (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)); see also United States v. Taylor, 519 F.3d 832, 834 (8th Cir. 2008) (affirming district court's finding that officers had probable cause to arrest defendant primarily because of an informant's tip that was corroborated by a controlled buy). Although the controlled buy had occurred approximately a month before Hinson's arrest, the passage of time did not make that information stale or otherwise destroy the officers' probable cause. See United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008) ("Standing alone, the fact the controlled buy was made two weeks before the warrant issued does not render the information in the application stale."). This is especially true where, as here, there is evidence that defendant's criminal activity was ongoing. See United States v. Cantu, 405 F.3d 1173, 1177 (10th Cir. 2005) ("When the circumstances suggest ongoing criminal activity, the passage of time recedes in importance."). Further, just a few days before police arrested Hinson, Pingry had told the police that he would be willing to set up another controlled buy with Hinson, and although he ultimately refused to follow through, his initial willingness to arrange the buy indicated that Hinson was still in the drug business. See Cantu, 405 F.3d at 1177-78 (stating that "otherwise stale information may be refreshed by more recent events").

Nor does it matter that Officer Dickerson, the arresting officer, did not personally observe the controlled buy. Dickerson was told that his colleagues in

the narcotics division had reason to stop Hinson.  This court recently held "that a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause."  United States v. Chavez, 534 F.3d 1338, 1347 (10th Cir. 2008).  Thus, the fact that Dickerson was not personally aware of the basis for the probable cause for Hinson's arrest is irrelevant because the officers instructing him to make the arrest had probable cause for the arrest.

Because we hold that Hinson's arrest was justified by the evidence of his drug trafficking activities, we need not and do not address whether his arrest was also justified due to his alleged traffic violations.

2.    *The Police Were Justified in Searching Hinson's Car Incident to His Arrest*[2]

The police were justified in searching Hinson's car incident to his arrest because it was "reasonable" for the officers "to believe evidence relevant to the crime of arrest might be found in the vehicle."  Arizona v. Gant, 129 S. Ct. 1710, 1719, 1723 (2009) (holding that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the

---

[2]Hinson does not contest that, if his arrest was permissible, the subsequent search of his person was justified.  See United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir. 2000) ("[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.") (citations and quotations omitted).

vehicle contains evidence of the offense of arrest") (citations and quotations omitted). The police had previously arranged a controlled buy where Hinson sold drugs to Pingry out of the very vehicle he was driving at the time of his arrest. Further, Pingry testified that Hinson would often deliver drugs to him. Thus, it was eminently reasonable for the officers to believe they would find evidence relevant to Hinson's drug trafficking offenses in his truck.

Alternatively, the police were justified in searching the contents of Hinson's truck after bringing the truck back to the police station. The police did not search Hinson's truck on the side of the road. Rather, they waited until the truck was at the station to search its contents, and Hinson does not argue that the police were unjustified in taking his truck to the station. Their subsequent search of the contents of his car was, therefore, justified as an inventory search. See United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003) ("It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound. Such inventories are now a well-defined exception to the warrant requirement of the Fourth Amendment.") (citations and quotations omitted).

      3.    *Any Error in Admitting this Evidence Did Not Affect the Outcome of the Trial*

Even if the district court erred by admitting evidence of the cash that Hinson was carrying at the time of his arrest, there is no reason to think that this

evidence affected the outcome of this proceeding. To demonstrate that any error in the admission of this evidence amounted to plain error, Hinson "must demonstrate the error 'affected the outcome of the district court proceedings.'" Portillo-Vega, 478 F.3d at 1202 (quoting United States v. Gonzalez-Huerta, 403 F.3d 727, 732-33 (10th Cir. 2005)). Given the other evidence the jury heard of Hinson's drug-trafficking activities—testimony that Hinson was Pingry's main supplier, testimony and physical evidence of a controlled buy in which Pingry purchased a quarter pound of methamphetamine from Hinson, and Hinson's own admission that he sold drugs, albeit not methamphetamine—it is highly unlikely that the jury was particularly swayed by the fact that, at the time of his arrest, Hinson was carrying a large amount of cash. The admission of that money into evidence, even if erroneous, does not rise to the level of plain error.[3]

C.   The District Court Did Not Plainly Err by Admitting Detective Hamilton's Hearsay Testimony that She Had Heard Hinson Was Pingry's Drug Supplier

_____

[3]Although this evidence did not affect the outcome of Hinson's trial, it significantly affected the district court's determination of Hinson's sentence. However, even if this evidence was inadmissible at trial, it was still appropriate to rely on that evidence at sentencing. The exclusionary rule does not bar the admission of the fruits of an illegal search at sentencing unless the illegal search was conducted with the intent to obtain evidence that would increase the defendant's sentence. See United States v. VanDam, 493 F.3d 1194, 1198 n.2 (10th Cir. 2007) ("[E]vidence obtained through an illegal search and seizure may be introduced at sentencing, unless the evidence was illegally gathered with the intent to secure an increased sentence."). There is no evidence that the officers in this case intended to wrongfully obtain this evidence in order to increase Hinson's sentence, so there was no error in considering that evidence at sentencing.

Detective Hamilton testified at Hinson's trial that she began investigating Mac Pingry based on her suspicion that he was selling drugs, and how that investigation eventually led to the defendant, Kevin Hinson. Early in her testimony she stated that, while investigating Mac Pingry, she "also heard the name of Kevin as being someone who actually supplied Mac Pingry with his methamphetamine ice, that was then distributed to the individual that [she] was initially investigating." (Appx. at 226.) She continued to explain how she built her case against Pingry and affirmed that Pingry's "initial interview with [her colleague] Detective Real confirm[ed her] earlier investigation that Mr. Pingry's source of supplies was a person by the name of Kevin." (Appx. at 232.) Further, that interview revealed that the "Kevin" she had heard about earlier was Kevin Hinson, the defendant.

Hinson argues that admission of this statement violated the hearsay rules. We agree. The government argues that this testimony was admissible to provide the jury with background information about the police's investigation of the defendant. However, "[a] prosecutor cannot justify the receipt of prejudicial, inadmissible evidence simply by calling it 'background' or 'context' evidence." United States v. Benitez-Avila, 570 F.3d 364, 369 (1st Cir. 2009). Out-of-court statements can be admitted as background for an investigation only if they provide information that is necessary to explain the government's subsequent actions, and it is not likely that the jury will "consider the statement[s] for the

truth of what was stated with significant resultant prejudice," United States v. Cass, 127 F.3d 1218, 1223-24 (10th Cir. 1997) (citations and quotations omitted).

In deciding whether an out-of-court statement is admissible to provide background for an investigation, this court firsts asks if this out of court statement is hearsay.

1. *Detective Hamilton's Statements Were Hearsay Because They Were Offered for Their Truth, Not for Relevant Background*

"Under Fed. R. Evid. Rule 801(c), 28 U.S.C.A., hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." United States v. Freeman, 816 F.2d 558, 563 (10th Cir. 1987). "Testimony which is not offered to prove the truth of an out-of-court statement, but is offered instead for relevant context or background, is not considered hearsay." United States v. Becker, 230 F.3d 1224, 1228 (10th Cir. 2000) (emphasis added). Thus, this court affirmed the admission of a police officer's testimony describing an informant's statements that the defendant would be distributing some counterfeit money at a certain location to explain why the police had that location under surveillance when that exchange took place. See Freeman, 816 F.2d at 560, 563. Similarly, this court affirmed the admission of an officer's testimony that he had received information that drugs were being sold from a certain address—but not the identity of the person allegedly selling those drugs—as background information explaining why

the police conducted a controlled buy at that address. See United States v. Wilson, 107 F.3d 774, 781 (10th Cir. 1997).

However, in Becker, this court held that the district court erred by admitting an officer's testimony that an informant had told him the defendant was selling and manufacturing drugs, where that information went "to precisely the issue the government was required to prove" and "the government clearly relied on the informant's statements as truthful," as evidenced by the government's reference to that information in its closing arguments. 230 F.3d at 1229 (citations and quotations omitted). Similarly, in Cass, this court held that statements ostensibly offered as background were, in fact, inadmissible hearsay because of "the extensive admission of [the] out-of-court statements, the fact that [the] evidence went directly to the defendant's guilt, and the [fact that the government used this] evidence to establish the truth of the matters asserted." 127 F.3d at 1224.

Ascertaining the purpose evidence serves, while essential to a determination of whether it constitutes inadmissible hearsay or admissible background information, is not an easy task. One useful clue that courts have looked to is whether the purported background evidence is necessary for the government to be able to tell a coherent story about its investigation. See United States v. Reyes, 18 F.3d 65, 70-72 (2d Cir. 1994) (holding that hearsay evidence ostensibly used to explain the officers' focus on the defendant in that case was

inadmissible because "[e]ven if there had been sufficient reason to explain to the jury why the agent investigated [the defendant], that explanation was amply provided" with other, admissible, evidence); United States v. Sallins, 993 F.2d 344, 346-47 (3rd Cir. 1993) (reversing defendant's conviction based on the introduction of inadmissible hearsay evidence—ostensibly admitted as background—of radio call to police in part because the police could have adequately explained their reasons for investigating the defendant without invoking this hearsay evidence). In this case, the "background" evidence offered by Detective Hamilton was entirely unnecessary to explain the context of the police investigation of Hinson. The reason the police focused their investigation on Hinson was perfectly clear: After arresting Pingry, he told the police that Hinson was his supplier. The government offered ample admissible evidence to show that this conversation took place, and Detective Nicholson's testimony that she had heard that someone named "Kevin" was Pingry's supplier was, therefore, completely unnecessary to explain the police's subsequent actions. Where the government introduces evidence that bears on the ultimate issue in a case but that is not necessary to explain the background of a police investigation, the only reasonable conclusion we can reach is that the evidence was offered, not as background, but as support for the government's case against the defendant. As the Third Circuit stated under very similar circumstances, "[t]he absence of a tenable non-hearsay purpose for offering the [hearsay evidence] establishes that

the evidence could have been offered only for its truth value." Sallins, 993 F.2d at 347 (emphasis added). Here too, the only purpose Hamilton's hearsay testimony served was to bolster the government's claim that Hinson was, in fact, Pingry's drug supplier. That purpose is impermissible, and this evidence should not have been admitted.

Nor should this evidence have been offered by the prosecution. This court has previously criticized the "'apparently widespread abuse'" of the background exception to the hearsay rule, although not in the particular context of the Kansas U.S. Attorney's Office. Cass, 127 F.3d at 1223 (quoting 2 McCormick on Evidence (4th ed.) § 249, at 104). We do not suggest that the problem is any more pronounced in the Kansas U.S. Attorney's Office than elsewhere, but we wish to remind all U.S. Attorney's Offices that, the Supreme Court stated more than seventy years ago, the U.S. Attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).[4]

2. *The District Court's Error in Admitting This Evidence Did Not Rise to the Level of "Plain Error"*

---

[4] While the prosecution's introduction of inadmissible hearsay evidence may not rise to the level of egregiousness that prompted the Court's admonition in Berger, prosecutors' frequent efforts to introduce inadmissible evidence suggests that the important message contained in Berger is being forgotten.

Where a defendant fails to object to the admission of testimony at trial, we will only reverse his conviction if that error affected the defendant's "substantial rights." See United States v. Cotton, 535 U.S. 625, 631 (2002) (stating that a court may only "correct an error not raised at trial" if that error affected the defendant's "substantial rights") (citations and quotations omitted). To satisfy this prong of the plain error analysis, a defendant generally must show "that the error . . . affected the outcome of the district court proceeding." Gonzalez-Huerta, 403 F.3d at 732 (quoting Cotton, 535 U.S. at 632); see also Olano, 507 U.S. at 734 ("In most cases, a court of appeals cannot correct [a] forfeited error unless the defendant shows that the error was prejudicial."); Portillo-Vega, 478 F.3d at 1202 ("In order to satisfy the third prong of plain error review, [the defendant] . . . must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." (citations and quotations omitted)).

We cannot say that the admission of Detective Hamilton's hearsay testimony affected the outcome of Hinson's trial. In addition to Hamilton's statement that she had heard a man named Kevin was Pingry's supplier, Pingry himself testified that Hinson was his supplier, and his testimony was corroborated by evidence produced during a controlled buy. It is unlikely that the officer's additional statements on this issue had any serious impact on the outcome of the trial, so any error in the admission of this evidence did not affect Hinson's

substantial rights.  See Schene, 543 F.3d at 640-41 (concluding that "error in admitting the testimony was not plain" in part because "the jury had already heard similar testimony from [another witness], and the other evidence of [defendant's] guilt was substantial"); United States v. Rackstraw, 7 F.3d 1476, 1482 (10th Cir. 1993) (concluding that admission of evidence did not "affect defendant's substantial rights" because "other strong evidence of his guilt was introduced at trial").

D.      The District Court Did Not Plainly Err by Admonishing Defendant That He Was Under Oath While Defendant Was on the Witness Stand

At trial, Hinson took the stand in his own defense.  On direct, Hinson discussed his phone records.  In particular, he described phone calls that took place between him and Mac Pingry, and even identified specific entries in his phone records that represented phone calls between him and Pingry.  He also testified that, at the controlled buy, he sold Pingry marijuana, not methamphetamine.

On cross, the government probed for more details about Hinson's admitted marijuana-selling.  During that line of questioning, the government asked Hinson what his drug dealer, "Javier's", phone number was.  Hinson replied, "I can't recall right now."  (Appx. at 542.)  A bit later, after identifying another dealer he worked with named "John", the government asked if Hinson, who had his phone records in front of him, could "find John and Javier's phone number[s]."  (Appx.

at 549.)  Hinson replied, "I can't recall which one.  There are a lot of phone numbers."  (App. at 549.)  Just a little later on in his testimony, Hinson was explaining how he was able to identify which call in his phone records had come from Mac Pingry the morning of the controlled buy.  He testified that Pingry had called him from an unfamiliar pay phone and stated, "that would be the only number that I don't recognize on that day . . . ."  (Appx. at 553.)  The government lawyer immediately saw an impeachment opportunity, and the following colloquy took place:

> Q: Yet you looked through the phone records and you can't find Javier's number or John's  number, can you?
>
> A: I'm not going to give you [either drug dealer's] number, to be honest with you.
>
> Lawyer: Your Honor, [I] ask you to order the witness to answer the question.
>
> Court: Mr. Hinson, you need to answer the question.  Mr. Watson asked for the numbers.  You said you couldn't locate it.  You have now indicated that you're not going to answer the question.
>
> Witness: I don't recall what numbers he had, sir.
>
> Court: Well, now you tell me, Mr. Hinson: What is your answer?  Are you telling Mr.– you said under oath you're not going to give Mr. Watson their numbers "to be honest with you."  I think that was your statement.
>
> Witness: Yes sir.
>
> Court: What is your testimony, reminding you that you're under oath?
>
> Witness: I can't find the numbers in there.  I don't recognize which ones.  There's a lot of phone calls, and that was in 2005.

- 21 -

Court: All right.

(Id. at 553-54.) Hinson argues that the district court committed plain error by interjecting and reminding Hinson he was under oath, thus suggesting that Hinson was not telling the truth.

We disagree. This colloquy reveals nothing untoward about the judge's admonition to the witness that he was under oath or his ultimately successful effort to elicit a clear response from the witness. This court has previously commented that a district court may question a witness in order "to develop material clarification. For this purpose, the presiding judge has not only the power but the duty to elicit the truth." Moore v. Strong, 360 F.2d 71, 77 (10th Cir. 1966). The judge in this case did not exceed that power. Hinson had contradicted his earlier statement that he could not find his dealers' numbers by stating that he would not give the prosecutor those numbers. The judge's attempt to clarify the truth—whether Hinson was unable or simply unwilling to identify his dealers' numbers—did not add any new information. The jury could tell, from listening to this testimony, that the witness had offered contradictory statements. Any further implication of dishonesty from the judge did not prejudice the defendant or materially implicate his credibility before the jury. See generally United States v. Nickl, 427 F.3d 1286, 1293 (10th Cir. 2005) ("A judge 'may

analyze and dissect the evidence, but he may not either distort it or add to it.'") (quoting Quercia v. United States, 289 U.S. 466, 470 (1933)).

Further, "[i]t is entirely proper—and often times it is imperative—that a witness be cautioned about the consequences of an oath." United States v. Vosper, 493 F.2d 433, 436 (5th Cir. 1974). In United States v. Greer, 806 F.2d 556 (5th Cir. 1986) (per curiam), the Fifth Circuit addressed circumstances similar to those in this case. The prosecution was persisting along a line of questioning and, after repeating the same answer a few times, the witness asked "if the prosecution wanted the truth." Greer, 806 F.2d at 559. At that point the court interjected with a reminder that the witness was under oath. The Fifth Circuit found that, in that context, the judge's brief admonition "was limited and appropriate." Id.. The same is true of the judge's statements to Hinson in this case.[5]

Further, even if there were error, which we conclude there was not, to prove that any error was "plain" the challenging party must prove "that, but for

---

[5] The cases that Hinson cites in support of his claim that the district court acted inappropriately in this case all involve far more egregious and prejudicial statements than the statements made in this case. See, e.g., Quercia, 289 U.S. at 471-72 (holding that trial judge committed reversible error by telling the jury that it was a "fact" that defendant's mannerism, wiping hands while testifying, "was almost always an indication of lying"); Nickl, 427 F.3d at 1292-93 (holding that trial judge committed reversible error by stating that he was firmly convinced the defendant had acted intentionally, an essential element of the offense she was charged with, where the defendant had offered conflicting testimony on that issue).

the error claimed, the result of the proceeding would have been different."

Portillo-Vega, 478 F.3d at 1202.  Hinson has not carried that burden here.  First, this colloquy did not implicate an issue central to the resolution of the merits of the case.  Second, the judge instructed the jury that they were the "sole judges of the credibility or 'believability' of each witness."  (App. at 617.)  That instruction was sufficient to cure any prejudice resulting from the judge's admonition that the defendant was under oath in this case.  See United States v. Sanders, 928 F.2d 940, 942 (10th Cir. 1991) (noting that "a limiting instruction" will "presumptively cur[e] any prejudicial impact on defendant").

E.  The District Court Did Not Plainly Err in Calculating the Amount of Drugs Attributed to Hinson for Sentencing Purposes

At sentencing, the district court relied, without objection, on the pre-sentence report's ("PSR's") calculation of Hinson's offense level.  The PSR calculated Hinson's offense level by adding the 153 grams of methamphetamine the jury attributed to Hinson for counts two and four, to the 10 pounds, or 4.54 kilograms based on Hinson's conviction for conspiracy to distribute at least 10 pounds of methamphetamine under count one, and adding an additional 1.5 kilograms by converting the $43,148 in cash found in Hinson's car and on his person on the day of his arrest into an equivalent amount of methamphetamine. Hinson argues that the court should have determined his sentenced based only on the 153 grams specifically attributed to him by the jury.

- 24 -

We disagree.  The jury convicted Hinson not only of possessing and distributing the 153 grams of methamphetamine attributed to Hinson based on count two of the indictment, but also, under count one of the indictment, of conspiracy to distribute at least 4.54 kilograms of methamphetamine.  We fail to understand the basis for Hinson's objection to the district court's reliance, for sentencing purposes, on the jury's conclusions that Hinson was responsible for these drugs.  Similarly, although we comprehend Hinson's argument that there was insufficient evidence to support the court's conversion of the $43,148 into its methamphetamine equivalent, we reject that argument.  The evidence at trial demonstrated that Hinson was a long-term methamphetamine dealer who sold drugs out of his car.  Further, Pingry testified that he sometimes saw Hinson throw drug money in boxes in his car, thus providing a specific evidentiary link between the money found in a box in Hinson's car and Hinson's drug activity.  Under these circumstances we cannot say that the district court committed plain error by concluding that the cash found in Hinson's car was drug money that should be converted into its methamphetamine equivalent for sentencing purposes.  See United States v. Jarvi, 537 F.3d 1256, 1263 (10th Cir. 2008) ("The guidelines provisions for related conduct allow a drug offender to be sentenced for cash 'in a case where cash is seized and where either no drug is seized or the amount seized does not reflect the scale of the offense . . . provided the court finds by a preponderance that the cash is attributable to drug sales which were

part of the same course of conduct or common scheme or plan as the conviction count.'") (quoting United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994) (ellipses in original).[6]

## III. Conclusion

For the foregoing reasons, we AFFIRM Hinson's conviction and sentence.

---

[6] We also reject Hinson's argument that, following the Supreme Court's decision in Gall v. United States, 552 U.S. 38 (2007), this court should insist that facts contributing to a defendant's sentence be found beyond a reasonable doubt. This court has already stated, post-Gall, that the standard remains proof by a preponderance of the evidence. See United States v. Tindall, 519 F.3d 1057, 1063 & n.2 (10th Cir. 2008) (citing Gall and noting that facts found for sentencing purposes need only be found by a preponderance of the evidence); see also United States v. Gambino-Zavala, 539 F.3d 1221, 1228 (10th Cir. 2008) (citing Tindall for the proposition that "[t]he government has the burden of proving by a preponderance of the evidence any findings necessary to support a sentence enhancement").