772 S.E.2d 189

The STATE, Respondent,

v.

Rakeem D. KING, Appellant.

Appellate Case No. 2012–213405.
No. 5313.

Court of Appeals of South Carolina.

Heard Nov. 18, 2014.
Decided April 22, 2015.
Rehearing Denied June 5, 2015.

404

Jenny L. Barwick, of Greenville, and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Deborah R.J. Shupe, both of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

FEW, C.J.

Rakeem D. King appeals his convictions for attempted murder, armed robbery, and possession of a firearm during the commission of a violent crime. We find the trial court erred by (1) charging the jury that a specific intent to kill is not an element of attempted murder and (2) allowing hearsay testimony as to the number of shots King fired. These errors require reversal of King's conviction for attempted murder. However, we find the court's errors caused King no prejudice as to his convictions for armed robbery and possession of a firearm during the commission of a violent crime, and we affirm those convictions. We remand for a new trial for attempted murder.

## I. Facts and Procedural History

On November 26, 2010 at 4:06 a.m., a customer called Yellow Cab requesting to be picked up at 1808 Carlton Street in North Charleston. The operator recorded the customer's telephone number from Yellow Cab's caller identification. At 4:11 a.m., Yellow Cab dispatched Dario Brown to that location. Brown was familiar with the Carlton Street area because his aunt had lived at 1809 Carlton—directly across the street from 1808 Carlton.

Brown testified he expected the customer to be his cousin because he lived in the area, and Brown had picked him up at the same location and time of night in the past. Brown saw a person coming from the yard of 1809 Carlton—his aunt's old house, which was abandoned at the time. When the person got into the back of the cab, Brown realized it was not his

cousin. Brown turned around, looked the man in the face, and asked why he came from the abandoned house. Brown and the man began to argue about whether the man lived at 1809 Carlton.

Brown testified he drove toward the dead-end of Carlton Street so he could make a U-turn and take the man to his destination. Brown stated that before he reached the end of the street, "I heard his cocking a pistol. When I looked back he had raised the gun to my face and told me to give him the money." Brown handed the man "give away money." The man told Brown it was not enough, however, and pointed the gun at the back of Brown's head. Brown testified, "I made an attempt to move [the gun] with my elbow and my forearm trying to move it out of the way telling him he doesn't have to rob me." The man demanded more money. Brown opened the door to the cab and had "one foot on the ground and [his] other foot on the brake." Brown testified the gun was "[s]till placed at the back of my neck." With his hands over his head, Brown "gave him a look in his eye" and testified the man "looked as if he was going to shoot me." When Brown tried again "to move the gun away from [his] face," the man shot Brown in the arm.

Brown testified he jumped from the cab and ran toward the dead-end of Carlton Street. "I look[ed] back and I[saw] him in pursuit behind me"—"maybe two steps behind me." Brown explained he tried to jump over a fence at the end of the street, "but my arm gave out so I kind of flipped head first over [the fence] and landed on my back." Brown testified, "When I hit the ground . . . he was . . . holding the gate with one hand and reaching over with his other hand with the gun in it." Brown testified the man fired another shot at him. Brown crawled behind a van, and the man fired more shots. Brown testified the man was "[s]till outside the gate saying that he is not going to shoot me anymore if I just give him the money." Brown stated, "I want to say in all I heard maybe six or seven shots but I can't be exact."

Brown eventually called the police from his cell phone. Officer Jennifer Butler testified she arrived at 4:21 a.m. and saw Brown's empty cab "that had run into a pole on the side of the road." Shortly thereafter, she made contact with

Brown and called emergency medical services. She did not see anyone else. After Brown was taken to the hospital, Officer Butler and a detective walked door-to-door "in the immediate area ... to speak with the people to see if they heard anything or happened to see anything." Over King's hearsay objection, Officer Butler testified she "learned there was more than one shot"—"[a]pproximately three or four shots" were fired.

Kelly Murphy—a crime scene technician—testified she found "a .25 auto shell casing" in the cab. Murphy also testified she and four other officers searched the Carlton Street area for two hours and found no other shell casings. Murphy conceded on cross-examination that "if there were shells there [I] needed to find them," and "if there were any of those anywhere [I] would have collected those."

Three days later, officers showed Brown a photographic lineup without a photograph of King, and Brown did not identify anyone from the lineup. Officers then traced the number recorded by the Yellow Cab operator and learned the phone was registered to a person who had given a falsified address. Using DMV records, officers located King, who had the same date of birth and a very similar address to those used to register the phone. Officers then prepared a second photographic lineup with a photograph of King, and Brown identified King as the man who shot and robbed him.

The jury found King guilty of attempted murder, armed robbery, and possession of a firearm during the commission of a violent crime. The trial court sentenced King to thirty years in prison for armed robbery and five years for possession of a firearm, with those sentences to run consecutive. For the attempted murder conviction, the trial court sentenced King to ten years in prison, concurrent with the other sentences.

## II. Jury Charge

King argues the State must prove as an element of attempted murder that King acted with specific intent to kill Brown. We agree, and thus we find the trial court erred when it charged the jury, "A specific intent to kill is not an element of attempted murder but it must be a general intent to commit serious bodily harm."

■ Section 16–3–29 of the South Carolina Code (Supp. 2014) defines attempted murder: "A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." Because the crime is defined by statute, we first look to the language of the statute to determine what the Legislature intended the elements of the crime to be— including the level of intent required. *See Guinyard v. State,* 260 S.C. 220, 227, 195 S.E.2d 392, 395 (1973) ("The power of the Legislature to declare what acts shall constitute crimes ... includes the power to make the commission of the act criminal without regard to the intent or knowledge of the accused.... Therefore, whether knowledge and intent are necessary elements of a statutory crime must be determined from the language of the statute...." (citing *State v. Manos,* 179 S.C. 45, 49–50, 183 S.E. 582, 584 (1936))).

■ If the language of a statute is "unambiguous and conveys a clear meaning," the court must determine the intent of the Legislature exclusively from that language, and other "rules of statutory interpretation are not needed." *State v. Elwell,* 403 S.C. 606, 612, 743 S.E.2d 802, 806 (2013) (internal punctuation omitted). The phrase "with intent to kill" in section 16–3–29 does not clearly indicate what level of intent the Legislature meant to require the State to prove because the word "intent" can mean anything from purpose to negligence. *See State v. Jefferies,* 316 S.C. 13, 18, 446 S.E.2d 427, 430 (1994) ("The required [intent] for a particular crime can be classified into a hierarchy of culpable states of mind in descending order of culpability, as purpose, knowledge, recklessness, and negligence."). Therefore, we must look beyond the words of the statute and use our rules of statutory construction to determine what the Legislature intended. *Cf. State v. Gaines,* 380 S.C. 23, 33, 667 S.E.2d 728, 733 (2008) ("Whenever possible, legislative intent should be found in the plain language of the statute itself. Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed....").

Section 16–3–29 was enacted in 2010 as part of the Omnibus Crime Reduction and Sentencing Reform Act. *See* Act No. 273, 2010 S.C. Acts 1947. Before 2010, our courts held

attempt crimes require the State to prove the defendant had specific intent to complete the attempted crime. *See, e.g., State v. Sutton*, 340 S.C. 393, 397, 532 S.E.2d 283, 285 (2000) (stating "[a]ttempt is a specific intent crime" and "[t]he act constituting the attempt must be done with the intent to commit that particular crime" (first alteration in original) (quoting 21 Am.Jur.2d *Criminal Law* § 176 (1998))); *State v. Thompson*, 374 S.C. 257, 262, 647 S.E.2d 702, 705 (Ct.App. 2007) ("A person is guilty of attempted armed robbery if the person has a specific intent to commit armed robbery."); *State v. Nesbitt*, 346 S.C. 226, 231, 550 S.E.2d 864, 866 (Ct.App.2001) ("Attempt crimes are generally ones of specific intent such that the act constituting the attempt must be done with the intent to commit that particular crime. In the context of an 'attempt' crime, specific intent means that the defendant consciously intended the completion of acts comprising the [attempted] offense. In other words, the completion of such acts is the defendant's purpose." (citations omitted)).

In *Sutton*—decided before the Legislature enacted section 16–3–29—our supreme court faced the question "whether attempted murder [was] an offense in this state." 340 S.C. at 396, 532 S.E.2d at 285. To answer the question, the court compared the elements of assault and battery with intent to kill (ABWIK) and the elements of attempted murder. 340 S.C. at 396–98, 532 S.E.2d at 285–86. Though the court "decline[d] to recognize a separate offense of attempted murder," 340 S.C. at 398, 532 S.E.2d at 286, it stated, "Attempted murder would require the specific intent to kill," and "specific intent means that the defendant consciously intended the completion of acts comprising the [attempted] offense." 340 S.C. at 397, 532 S.E.2d at 285.

■ With this history of our courts requiring the State to prove specific intent as an element of attempt crimes, the Legislature chose to include the phrase "with intent to kill" in section 16–3–29. The Legislature is presumed to know how the terms and phrases it uses in a statute have been interpreted in the past. *See State v. Bridgers*, 329 S.C. 11, 14, 495 S.E.2d 196, 197–98 (1997) ("The General Assembly is presumed to be aware of the common law, ... and where a statute uses a term that has a well-recognized meaning in the law, the presumption is that the General Assembly intended to

use the term in that sense." (citation omitted)); *see also Shirley's Iron Works, Inc. v. City of Union,* 403 S.C. 560, 570, 743 S.E.2d 778, 783 (2013) (stating "this Court must presume the legislature knew of and contemplated [existing legislation] in enacting [an act]"); *Grier v. AMISUB of S.C., Inc.,* 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012) (stating "Congress presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind" (citation and internal quotation marks omitted)); *Wigfall v. Tideland Utils., Inc.,* 354 S.C. 100, 111, 580 S.E.2d 100, 105 (2003) ("The Legislature is presumed to be aware of this Court's interpretation of its statutes."); *State v. McKnight,* 352 S.C. 635, 648, 576 S.E.2d 168, 175 (2003) ("There is a presumption that the legislature has knowledge of previous legislation as well as of judicial decisions construing that legislation when later statutes are enacted concerning related subjects."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 320 (2012) ("[W]ords undefined in a statute are to be interpreted and applied according to their common-law meanings.").

The Legislature's use of the phrase "with intent to kill," considered in light of our courts' prior rulings that specific intent is required for attempt crimes—particularly the supreme court's statement in *Sutton,* "Attempted murder would require the specific intent to kill" [1]—indicates the Legislature intended to require the State to prove the specific intent to kill as an element of attempted murder. *See also Elwell,* 403 S.C. at 612, 743 S.E.2d at 806 (stating "penal statutes will be strictly construed against the state"); Jeffrey F. Ghent, Annotation, *What Constitutes Attempted Murder,* 54 A.L.R.3d 612, 622 (1973) (describing "the general rule that the ... elements of ... attempted murder [include] a specific intent to commit murder" (footnote omitted)).

The State argues, however, the Legislature intended to codify the common law crime of ABWIK when it enacted section 16–3–29, and because a specific intent to kill was not an element of ABWIK, the Legislature did not intend to require a specific intent to kill as an element of attempted

---

1. 340 S.C. at 397, 532 S.E.2d at 285.

murder. To support its argument that section 16–3–29 is a codification of ABWIK, the State points to the following language in the Omnibus Crime Reduction and Sentencing Reform Act: "The common law offenses of [ABWIK and others] are abolished," and, "[W]herever in the 1976 Code reference is made to [ABWIK], it means attempted murder as defined in Section 16–3–29." Act No. 273, 2010 S.C. Acts 1949–50.

We disagree with the State's argument. First, the statement that ABWIK is "abolished"-with no reference to the abolished crime being codified as attempted murder-is inconsistent with the State's position. Second, we find the Legislature included the statement "[ABWIK] ... means attempted murder" to avoid any confusion as to how the new crime of attempted murder affects the operation of other statutes that contain the phrase "assault and battery with intent to kill." For example, subsection 17–30–70(A)(1) of the South Carolina Code (2014) authorizes a circuit judge to sign "an order authorizing or approving the interception of wire, oral, or electronic communications" for the investigation of certain crimes, including "assault and battery with intent to kill." The language relied on by the State simply makes clear that a judge may sign such an order for the investigation of attempted murder even though that crime is not specifically listed in the subsection. Similarly, section 17–19–40 of the South Carolina Code (2014) provides that in indictments for certain crimes such as murder and ABWIK, "when the crime is charged to have been committed with a deadly weapon ...,  there shall be a special count in the indictment for carrying concealed weapons." The language relied on by the State simply makes clear that section 17–19–40 also applies to attempted murder.

We find the Legislature intended to require the State to prove specific intent to commit murder as an element of attempted murder, and therefore the trial court erred by charging the jury that attempted murder is a general intent crime.

### III.  Hearsay Testimony

King argues the trial court erred in admitting Officer Butler's testimony that she "learned there was more than one

shot" and "[a]pproximately three or four shots" were fired. We agree the testimony contained hearsay and should have been excluded.

After Officer Butler described going door-to-door to speak to neighbors, the assistant solicitor asked, "Did you make contact with anyone in the area?" She initially answered, "[W]e were able to speak to I believe it was two people and they were able to confirm. . . ." At that point, King objected on the basis of hearsay, and the trial court sustained the objection. The assistant solicitor rephrased the question, asking, "What did you learn as you [talked to those neighbors]?" King again objected, but the trial court overruled the objection, stating, "I'll—she can testify to what she learned." Officer Butler answered, "I learned there was more than one shot"—"[a]pproximately three or four shots."

Officer Butler did not see or hear any shots, and thus she did not have personal knowledge of the number of shots fired. Rather, her knowledge was based exclusively on statements made to her by neighbors when she walked the area after Brown was taken to the hospital. By testifying to the number of shots fired, Officer Butler testified to the content of the neighbors' out-of-court statements. The State offered her testimony to prove the truth of the neighbors' statements. Therefore, her testimony as to the number of shots fired was hearsay. *See* Rule 801(c), SCRE (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

The State argues the testimony was not hearsay because, "Testimony of a police officer regarding [her] conclusions from an investigation is not hearsay." The State contends "Officer Butler merely testified about what her investigation . . . revealed," and, "She did not repeat any specific statements made by the people she interviewed." The State relies on *State v. Kromah*, 401 S.C. 340, 737 S.E.2d 490 (2013) and *State v. Weaver*, 361 S.C. 73, 602 S.E.2d 786 (Ct.App.2004), *aff'd as modified*, 374 S.C. 313, 649 S.E.2d 479 (2007). Neither opinion supports the State's position.

In *Kromah*, two State witnesses "testif[ied] regarding the actions they took as a result of hearsay statements made by

the three-year-old Child." 401 S.C. at 354, 737 S.E.2d at 497. Kromah asserted one witness "was permitted to testify that following her conversation with the child, she turned the information over to law enforcement," and the second witness—the arresting officer—"was permitted to testify that following his conversation with the child, he arrested petitioner the next day." *Id.* Kromah argued the trial court erred in admitting the officer's testimony because it revealed the content of the child's hearsay statements, and thus the live testimony itself "constituted inadmissible hearsay." 401 S.C. at 355, 737 S.E.2d at 498.

The supreme court found the testimony was not hearsay. *Id.* The court stated the officer "testified in detail about his investigative process and the numerous individuals he spoke to, including the Child, and that he made his decision to arrest Kromah based on *all* of this information." *Id.* The court found the officer's "testimony referencing his interview of the Child ... was only one part of the information he recited in his investigative process leading up to his [decision] to arrest Kromah, and we find his testimony ... did not repeat what the Child said to him." *Id.*

This case is distinguishable from *Kromah.* There, the officer had an entire "investigative process" on which to base his decision to make an arrest, and the child's out-of-court statements were "only one part of the information" the officer obtained in that investigation. *Id.* Because the officer might have relied on any part of his investigation in deciding to arrest Kromah, his testimony did not necessarily reveal the content of the child's statements. Officer Butler, however, had only the neighbors' out-of-court statements on which to rely as the basis of her testimony. Therefore, her testimony was based exclusively on hearsay statements, and she necessarily revealed the content of those statements when she testified as to the number of shots fired.

The State also relies on *Weaver,* where an investigating officer testified, "All of the witnesses that I talked to led me to believe ... [the defendant] was the only suspect that really was involved...." 361 S.C. at 85, 602 S.E.2d at 792. Weaver argued the testimony was inadmissible because it "was based on what witnesses told" the officer, and thus was hearsay

because it revealed the content of their out-of-court state-ments. *Id.* This court found the testimony was not hearsay for two reasons. First, we stated the officer "never repeated statements made to him." 361 S.C. at 86, 602 S.E.2d at 792. Second, we explained that the "testimony was in response to the questions asked on cross-examination as to why [the officer] did not perform a gunshot residue test on everyone at the crime scene." 361 S.C. at 86, 602 S.E.2d at 792–93. Therefore, the evidence was not offered to prove the truth of the matter asserted, but "was offered to explain this part of his investigation." 361 S.C. at 86, 602 S.E.2d at 793.

The *Weaver* court found the officer's live testimony was not hearsay because it was not offered to prove the truth of the out-of-court statements, and the *Kromah* court found the officer's live testimony was not hearsay because it did not necessarily reveal the content of out-of-court statements. But both courts recognized live testimony—such as Officer But-ler's—can be hearsay under certain circumstances. Numer-ous other courts have reached the same conclusion. In *Weems v. State,* 269 Ga. 577, 501 S.E.2d 806 (1998), for example, the Supreme Court of Georgia considered an objec-tion to testimony from an "investigating detective [who] testi-fied . . . that a police canvass of the area where the shooting took place resulted in police learning 'that a possible suspect was Fernando.'" 501 S.E.2d at 808. The court found the officer's live testimony was hearsay because the officer "tes-tif[ied] . . . to what other persons related to [him] during the investigation." [2] *Id.*

Similarly, in *United States v. Baker,* 432 F.3d 1189 (11th Cir.2005), the Eleventh Circuit considered an objection to testimony from an officer who "testified that his investigation . . . 'revealed' [the identity of] the gunman." 432 F.3d at 1206. The court held the officer's live testimony was hearsay "even though [the testimony did] not explicitly paraphrase the words of others, [because] the only conceivable explanation for how

---

2. *Weems* was decided under former Official Code of Georgia Annotated section 24–3–2. *Id.* Section 24–3–2 was part of the Georgia Code that defined hearsay. *See Momon v. State,* 249 Ga. 865, 294 S.E.2d 482, 484 (1982) (explaining "Code [section] 38–302 [predecessor to section 24–3–2] should be understood not as an exception to the rule against hearsay but as an explanation of what is not hearsay").

[the officer] discovered this information is through listening to the statements of others." *Id.* (citing *United States v. Shiver,* 414 F.2d 461, 463 (5th Cir.1969) (finding a detective's testimony that his investigation "revealed" a certain car was stolen was "pure hearsay, since he could not have known the facts of his own knowledge")).

The Tenth Circuit addressed a situation similar to ours in *United States v. Hinson,* 585 F.3d 1328 (10th Cir.2009). A police detective "testified . . . she began investigating [another person] based on her suspicion that he was selling drugs." 585 F.3d at 1336. She explained the other person's "initial interview . . . confirm[ed her] earlier investigation that [his] source of supplies was a person by the name of Kevin," and "the 'Kevin' she had heard about earlier was Kevin Hinson, the defendant." *Id.* (first alteration in original). The Tenth Circuit found the detective's live testimony "violated the hearsay rules." *Id.* Like this court did in *Weaver,* the Tenth Circuit analyzed the purpose for which the government offered the evidence. 585 F.3d at 1336–37. The court noted, "Testimony which is not offered to prove the truth of an out-of-court statement, but is offered instead for *relevant* context or background, is not considered hearsay." 585 F.3d at 1336 (quoting *United States v. Becker,* 230 F.3d 1224, 1228 (10th Cir.2000)). The court then found "the only purpose [the detective]'s hearsay testimony served was to [prove] . . . that Hinson was, in fact, [the] drug supplier." 585 F.3d at 1337. The court held, "That purpose is impermissible, and this evidence should not have been admitted." *Id.*

Here, the State had no purpose for offering Officer Butler's testimony except to prove the truth of the neighbors' statements that more than one shot was fired. The State did not argue at trial or on appeal that her testimony on this subject was necessary to explain her conduct or to give context to other testimony. *Cf. State v. Brown,* 317 S.C. 55, 63, 451 S.E.2d 888, 894 (1994) (explaining "an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken" and "these statements were not entered for their truth but rather to explain why the officers began their surveillance"); [3] *see*

---

3. *Brown* was tried before we adopted the Rules of Evidence. *See* Rule 1103(b), SCRE ("These rules shall become effective September 3,

*also Caprood v. State,* 338 S.C. 103, 111, 525 S.E.2d 514, 518 (2000) (stating "officers' statements . . . were similar to those in *Brown* in that . . . the officers were explaining their actions . . . and the statements were not offered for their truth"). The State appears to concede it offered the testimony to prove the number of shots King fired by arguing "Officer Butler merely testified about what her investigation . . . revealed." We find Officer Butler's testimony was hearsay because it was based exclusively on what other witnesses told her—thereby necessarily revealing the content of out-of-court statements— and the State offered her testimony to prove the truth of those statements. Therefore, the trial court erred by admitting the testimony.

### IV. Prejudice and Harmless Error

The State contends the trial court's errors did not prejudice King and were harmless beyond a reasonable doubt. *See State v. Tapp,* 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012) ("Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it could not reasonably have affected the result of the trial." (citations and internal quotation marks omitted)); 398 S.C. at 389–90, 728 S.E.2d at 475 ("Engaging in this harmless error analysis, we . . . question . . . whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict."); *State v. Belcher,* 385 S.C. 597, 611, 685 S.E.2d 802, 809 (2009) ("Errors, including erroneous jury instructions, are subject to harmless error analysis."); *State v. Weston,* 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006) ("The improper admission of hearsay is reversible error only when the admission causes prejudice.").

██ We find the trial court's errors prejudiced King as to his attempted murder conviction, affected the result of his trial on that charge, and thus were not harmless beyond a reasonable doubt. One of the key issues at trial was whether

---

1995."). However, our definition of hearsay did not change with the adoption of the Rules. *See* Rule 801, SCRE, "Notes" (stating "[s]ubsection (c) is consistent with South Carolina law").

King continued to shoot at Brown after they exited the cab. Brown testified "six or seven" shots were fired, all but one of which were fired outside the cab. However, there are specific facts in this case that could lead a jury to find King fired only one shot. In particular, Brown was dispatched to Carlton Street at 4:11 a.m. He testified it took him "[a] minute, two minutes" to get there. Officer Butler testified she arrived on the scene at 4:21 a.m. Officers searched the area for hours and found only one shell casing. Under these circumstances, it seems highly unlikely King could have robbed and shot Brown in the cab, chased him down Carlton Street while shooting at him, and then retrieved all the shell casings in the dark before Officer Butler arrived.

Brown's testimony that he repeatedly pushed King's gun away supports the inference that when King shot Brown in the cab, he did so in a struggle and did not intend to kill Brown. It is more difficult to imagine, however, that King could have chased Brown down Carlton Street while shooting at him unless he specifically intended to kill Brown. Thus, the State presented a stronger case for attempted murder from the shots fired during the chase. These circumstances made Officer Butler's testimony as to the number of shots fired critical to the State's ability to prove King continued to shoot at Brown after they exited the cab, and thus made her testimony important to the State's ability to prove King guilty of attempted murder.

Therefore, we find Officer Butler's inadmissible testimony as to the number of shots King fired affected the jury's verdict on attempted murder, and we cannot say that either the admission of the evidence or the erroneous jury charge are harmless beyond a reasonable doubt.

■ We find beyond a reasonable doubt, however, the trial court's errors did not prejudice King as to his armed robbery and possession of a firearm convictions because the errors did not affect the result of his trial on those charges. Obviously, the jury charge on attempted murder did not affect King's conviction for armed robbery. As to the armed robbery itself, there is no evidence contradicting Brown's testimony that King shot Brown *in* the cab during an attempt to rob him. Brown testified he handed "give away money" to King while

they were still in the cab. Thus, King has not shown that either the jury charge on attempted murder or the admission of Officer Butler's testimony as to the number of shots fired had any effect on the armed robbery or the possession of a firearm charges. Because King failed to demonstrate prejudice from the trial court's errors as to those convictions, we affirm. *See State v. Black*, 400 S.C. 10, 16–17, 732 S.E.2d 880, 884 (2012) ("To warrant reversal [for the admission of evidence], an error must result in prejudice to the appealing party."); *Gaines*, 380 S.C. at 31, 667 S.E.2d at 732 ("To warrant reversal, a trial court's . . . jury charge must be both erroneous and prejudicial to the defendant.").

## V. Other Issues On Appeal

We affirm as to King's remaining issues pursuant to Rule 220(b), SCACR, and the following authorities:

1. As to the trial court's charge to the jury that "[m]alice may be inferred . . . when the deed is done with a deadly weapon": *see Belcher*, 385 S.C. at 612, 685 S.E.2d at 810 (holding "where evidence is presented that would reduce, mitigate, excuse or justify a homicide (or assault and battery with intent to kill) caused by the use of a deadly weapon, juries shall not be charged that malice may be inferred from the use of a deadly weapon"); *id.* ("The permissive inference charge concerning the use of a deadly weapon remains a correct statement of the law where the only issue presented to the jury is whether the defendant has committed [attempted] murder. . . ."). We find no basis for reducing, mitigating, excusing, or justifying King's conduct. *See State v. Smith*, 391 S.C. 408, 415, 706 S.E.2d 12, 16 (2011) ("Because [the defendant] was acting unlawfully, he was not entitled to an accident charge.").

2. As to the trial court allowing the State to publish King's detention center phone call: *see* Rule 403, SCRE (stating "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"); *State v. Gray*, 408 S.C. 601, 616, 759 S.E.2d 160, 168 (Ct.App.2014) ("Prejudice that is 'unfair' is distinguished from the legitimate impact all evidence has on the outcome of a case."); *id.* ("Unfair prejudice does not mean the damage

to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." (citation omitted)); *State v. Dickerson,* 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011) ("The admission of evidence is within the [trial] court's discretion and will not be reversed on appeal absent an abuse of that discretion."); *State v. Lee,* 399 S.C. 521, 527, 732 S.E.2d 225, 228 (Ct.App.2012) ("A trial court has particularly wide discretion in ruling on Rule 403 objections.").

3. As to the trial court's admission of King's cell phone records: *see State v. Robinson,* 410 S.C. 519, 527, 765 S.E.2d 564, 568 (2014) (stating "the Fourth Amendment is not triggered unless a person has an actual and reasonable expectation of privacy"); *Smith v. Maryland,* 442 U.S. 735, 743–44, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220, 229 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71, 79 (1976) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

## VI. Conclusion

We find the trial court erred in charging the jury that a specific intent to kill is not an element of attempted murder and in admitting Officer Butler's hearsay testimony. Because we find these errors prejudiced King as to his conviction for attempted murder, we reverse and remand for a new trial. We affirm King's convictions for armed robbery and possession of a firearm.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

LOCKEMY, J., concurs.

WILLIAMS, J., concurs in result only.