CHIEF JUSTICE BEATTY :
**50 A jury convicted Raheem D. King of the attempted murder[1] and armed robbery of a Charleston cab driver and the related charge of possession of a firearm during the commission of a violent crime. The trial judge sentenced King to an aggregate term of thirty-five years' imprisonment for armed robbery and the weapon charge, and a concurrent term of ten years' imprisonment for attempted murder.
On appeal, the Court of Appeals affirmed King's convictions for armed robbery and possession of a firearm during the commission of a violent crime, but reversed and remanded King's conviction for attempted murder. State v. King , 412 S.C. 403, 772 S.E.2d 189 (Ct. App. 2015). In so ruling, the Court of Appeals found the trial judge: (1) erred in charging the jury that "[a] specific intent to kill is not an element of attempted murder but it must be a general intent to commit serious bodily harm"; (2) erred in admitting the hearsay testimony of an investigating officer; (3) correctly charged the jury the permissive inference of malice from the use of a deadly weapon; and (4) did not abuse his discretion in allowing the State to publish to the jury a recording of a phone call made by King while he was incarcerated. The Court of Appeals concluded the trial judge's errors warranted reversal of King's *20 conviction for attempted murder, but found no prejudice as to his convictions for armed robbery and possession of a firearm during the commission of a violent crime.
After the Court of Appeals denied the parties' petitions for rehearing, this Court granted their cross-petitions for a writ of certiorari to review the rulings of the Court of Appeals as outlined above. For reasons that will be discussed, we affirm as modified.
**51 I. Factual / Procedural History
On November 26, 2010, at 4:06 a.m. a customer, who identified himself as "Kevin," called Yellow Cab requesting to be picked up at 1808 Carlton Street in North Charleston. The operator recorded the customer's telephone number from Yellow Cab's caller identification, but noted that the number did not match the telephone number verbally identified by the customer. At 4:11 a.m., Dario Brown was dispatched to the address. Brown was familiar with the Carlton Street area because he had lived on the street for several years and his aunt had lived at 1809 Carlton Street, which was located directly across the street from 1808 Carlton Street. Brown expected his cousin to be the customer since he lived in the area and Brown, in the past, had picked up his cousin at the same location and time of night.
When he arrived at the pick-up location, Brown saw a man crossing the yard of 1809 Carlton Street, the location of his aunt's home which was abandoned at that time. As the man got into the backseat of the cab, which was illuminated by the dome light, Brown noticed the man was not his cousin. Brown then turned around, looked at the man directly in his face, and asked why he came from the abandoned house. The man replied that it was his yard. The two men argued as Brown continued to question the customer about whether he lived at 1809 Carlton Street.
As Brown began to drive toward the dead-end of Carlton Street to make a U-Turn, he heard the man "cocking a pistol." Brown testified that when he turned around the man had raised the gun to his face and demanded money. Brown stated that he gave the man his "give away" money, which is a stack of small bills cab drivers keep readily available in the event they are robbed, then placed his hands in the air. Brown testified the man demanded more money and pointed the gun at the back of Brown's head. At that point, with his hands in the air, Brown attempted to move the gun with his elbow and forearm. According to Brown, he tried to reason with the man, stating "[you] [don't] have to do this." Brown testified the man ignored his pleas and demanded more money.
Brown then opened his cab door and attempted to flee but was too scared to move because the gun was still placed at the **52 back of his neck. When Brown looked into the man's eyes, he believed the man was going to shoot him. As Brown tried again to move the gun away from his face, the man shot Brown in the elbow. The shot entered Brown's elbow and exited through his forearm.
After being shot, Brown jumped out of the cab and ran toward the dead-end of Carlton Street. Brown testified, at one point, he looked behind him and the man was "two steps behind [him]." Brown then ran toward a yard and attempted to jump over the fence, but ended up flipping over the fence due to his injured arm. When he fell over the fence, he landed on his back fracturing a vertebra in the process.
According to Brown, the man reached over the fence with a gun and shot at Brown "maybe six or seven" times. Brown testified that none of the bullets hit him and he was able to crawl behind a nearby van at which point he used his cellphone to call police.
At 4:20 a.m., Officer Jennifer Butler with the North Charleston Police Department was dispatched to 1808 Carlton Street and arrived within one minute of the call. When she arrived, Officer Butler saw an empty cab with the engine still running "that had run into a pole on the side of the road." Officer Butler then saw Brown and called EMS. During that time, several other officers and a canine unit responded to the scene.
As part of their investigation, Officer Butler and a detective canvassed the surrounding neighborhood. As a result of this "knock-and-talk," Officer Butler testified, over defense counsel's objection, that she talked to *21 two people and learned that there were "[a]pproximately three or four shots" fired that night. Despite a two-hour search of the area, the officers did not find the suspect and only recovered one bullet casing inside the cab.
Three days later, officers showed Brown a six-person photographic lineup that did not include a photograph of King. Brown, however, did not identify anyone from the lineup. Officers then contacted the cellphone company, Cricket Wireless, to determine who subscribed to the cellphone number used to contact the cab company on the night of the robbery. Cricket Wireless informed investigators that the phone number **53 was registered to "Kevin King" with a 1991 date of birth and address listed as 3440 Elliott Street. By cross-referencing DMV records, investigators located Raheem King, who had the same date of birth and a similar residence address as the Cricket Wireless subscriber.
Based on this information, the police compiled a second photographic lineup that contained King's photograph. When Brown viewed this lineup, he immediately identified King and expressed that he was "100 percent sure" of his identification. The next day, King was arrested and charged with attempted murder, armed robbery, and possession of a firearm during the commission of a violent crime.
From the detention center, King made sixty-three calls in one month to the cellphone number used to call the cab company on the night of crime. During the first phone call, which was made immediately following his arrest, King provided an unidentified person with a pin number to the cellphone. Over the objection of defense counsel, the trial judge permitted the State to publish to the jury the entire fifteen-minute recording.
As part of the instructions to the jury, the trial judge explained the offenses of armed robbery, attempted armed robbery, attempted murder, assault and battery of a high and aggravated nature ("ABHAN"), assault and battery in the first-degree, and possession of a firearm during the commission of a violent crime.
With respect to attempted armed robbery, the judge instructed, in part, that:
An attempt is an effort to accomplish a crime which does not succeed. An attempt includes a specific intent to do a particular criminal act along with that act falling short of the act intended. The State must show more than mere preparation and intent. It must be some overt act committed and the effort to commit the crime. Intent means intending the results which actually occurred not accidentally or involuntarily. Intent may be shown by acts and conduct of the defendant in other circumstances from which you may naturally and reasonably infer intent.
The judge then instructed that a person commits the offense of attempted murder if the "person with the intent to kill **54 attempts to kill another person with Malice Aforethought either expressed or implied." As part of his instruction, the judge charged that "[m]alice may be inferred from conduct showing a total disregard for human life." Further, over the objection of defense counsel, the judge charged that: (1) "[i]nferred malice may also arise when the deed is done with a deadly weapon"; and (2) "[a] specific intent to kill is not an element of Attempted Murder but it must be a general intent to commit serious bodily harm."
During deliberations, the jury sent a note to the trial judge expressing confusion over the difference between the definition of attempted murder and ABHAN. In response, the judge gave a supplemental instruction indicating that ABHAN does not require malice. Ultimately, the jury found King guilty of attempted murder, armed robbery, and possession of a firearm during the commission of a violent crime.
On appeal, the Court of Appeals affirmed King's convictions for armed robbery and possession of a firearm during the commission of a violent crime, but reversed and remanded King's conviction for attempted murder. State v. King , 412 S.C. 403, 772 S.E.2d 189 (Ct. App. 2015). After the Court of Appeals denied the parties' petitions for rehearing, this Court granted, in part, the parties' cross-petitions for a writ of certiorari *22 to review the decision of the Court of Appeals.
II. Standard of Review
"In criminal cases, this Court sits to review errors of law only and is bound by factual findings of the trial court unless an abuse of discretion is shown." State v. Laney , 367 S.C. 639, 643, 627 S.E.2d 726, 729 (2006). An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. State v. Black , 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012).
III. Discussion
A. Requisite Mens Rea for the Statutory Crime of Attempted Murder
The State contends the Court of Appeals erred in holding that attempted murder, as defined by section 16-3-29 of the South Carolina Code, is a specific-intent crime. In **55 support of this contention, the State claims the Court of Appeals incorrectly based its conclusion on common law "attempt" cases and dicta from this Court's decision in State v. Sutton , 340 S.C. 393, 532 S.E.2d 283 (2000), stating that a common law attempted murder charge "would require the specific intent to kill."
In contrast to the authorities cited by the Court of Appeals, the State directs this Court's attention to case law involving the common law crime of assault and battery with intent to kill ("ABWIK"), which held that ABWIK does not require a specific intent to kill. Because the attempted murder statute "uses language virtually identical to common law ABWIK," the State reasons that the General Assembly effectively codified the common law offense of ABWIK. As a result, the State avers the statutory offense of attempted murder does not require a specific intent to kill but, rather, a general intent will suffice.
Alternatively, even if the Court determines that attempted murder is a specific-intent crime, the State maintains any jury instruction error was harmless beyond a reasonable doubt. Given the judge instructed the jury on "common law attempt as a specific intent to commit the underlying offense" and the statutory elements of attempted murder, including "intent to kill" and "malice aforethought," the State claims all elements of attempted murder were in fact charged and, thus, effectively negated the judge's charge that attempted murder was a general-intent crime.
We agree with the Court of Appeals that "the Legislature intended to require the State to prove specific intent to commit murder as an element of attempted murder, and therefore the trial court erred by charging the jury that attempted murder is a general intent crime." King , 412 S.C. at 411, 772 S.E.2d at 193. Because the phrase "with intent to kill" in section 16-3-29 does not identify what level of intent is required, the Court of Appeals properly looked to the legislative history of section 16-3-29 and appellate decisions holding that "attempt crimes require the State to prove the defendant had specific intent to complete the attempted crime." Id. at 409, 772 S.E.2d at 192. Further, while we agree with the State that the statement referenced from Sutton constitutes dicta, it **56 is still an accurate statement of law. Id. (" 'Attempted murder would require the specific intent to kill,' and 'specific intent means that the defendant consciously intended the completion of acts comprising the [attempted] offense.' " (quoting Sutton , 340 S.C. at 397, 532 S.E.2d at 285 )).
Nevertheless, despite our agreement with the conclusion reached by the Court of Appeals, we find it necessary to expand on the analysis. Specifically, because the Court of Appeals did not sufficiently parse section 16-3-29, it neglected to address the implications of the phrase "malice aforethought, either express or implied."
While it may seem counterintuitive for the attempt of a crime to require a higher level of mens rea than that of the completed crime, this is the majority rule and a rule that our appellate courts and General Assembly have followed. Consequently, as will be discussed, we hold that a specific intent to kill is an element of attempted murder as codified in section 16-3-29.
"The highest possible mental state for criminal attempt, specific intent, is necessary because criminal attempt focuses on the dangerousness *23 of the actor, not the act." 22 C.J.S. Criminal Law: Substantive Principles § 156, at 221-22 (2016). Thus, "[a]s the crime of attempt is commonly regarded as a specific intent crime and as it is logically impossible to attempt an unintended result, prosecutions are generally not maintainable for attempts to commit general intent crimes, such as criminal recklessness, attempted felony murder, or attempted manslaughter." Id.
Based on these general principles, the majority of courts in other jurisdictions have concluded that attempted murder requires the specific intent to kill. See generally Jeffrey F. Ghent, Annotation, What Constitutes Attempted Murder , 54 A.L.R.3d 612, §§ 3, 12.5 (1973 & Supp. 2017) (collecting state and federal cases identifying what constitutes the crime of attempted murder, including whether specific intent is a requisite element). In reaching this conclusion, these courts have differentiated between the required mental states for attempted murder and murder.
For example, in Keys v. State , 104 Nev. 736, 766 P.2d 270 (1988), the Supreme Court of Nevada found that it was error **57 for the trial court to refuse to instruct the jury that the specific intent to kill is an essential element of the crime of attempted murder. Recognizing that this issue presented "a continuing source of confusion," the court sought to clarify this area of criminal law by distinguishing the crime of attempted murder from murder by analogizing express malice to a specific intent to kill. Id. at 272-73. The court explained:
Attempted murder can be committed only when the accused's acts are accompanied by express malice, malice in fact. One cannot attempt to kill another with implied malice because there " 'is no such criminal offense as an attempt to achieve an unintended result.' " An attempt, by nature, is a failure to accomplish what one intended to do. Attempt means to try; it means an effort to bring about a desired result. Thus one cannot attempt to be negligent or attempt to have the general malignant recklessness contemplated by the legal concept, "implied malice." One cannot be guilty of attempted murder by implied malice because implied malice does not encompass the essential specific intent to kill.
An attempt to kill with express malice is, on the other hand, completely consistent with the specific intent requirement of the crime of attempt. Express malice is the "deliberate intention unlawfully" to kill a human. Attempted murder, then, is the attempt to kill a person with express malice, or more completely defined: Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill.
Id. at 273 (citations omitted) (second emphasis added).
Although our appellate courts have not issued an expository opinion like that of the Supreme Court of Nevada, we believe the decisions, when viewed as a whole, reach the same conclusion. Like other jurisdictions, South Carolina has not been immune from conflicting case law regarding levels of criminal intent. However, this confusion appears to have arisen out of the relationship between the crimes of murder and ABWIK. See 23 S.C. Jur. Homicide § 34, at 215 (1994) (recognizing ambiguity in case law regarding whether a specific intent to kill is required for the crime of ABWIK); see also State v. Jefferies , 316 S.C. 13, 18, 446 S.E.2d 427, 430 (1994) ("At **58 common law, crimes generally were classified as requiring either 'general intent' or 'specific intent.' This venerable distinction, however, has been the source of a good deal of confusion." (citation omitted)).
Significantly, the two crimes were originally designated as one offense. See State v. Jones , 133 S.C. 167, 172, 130 S.E. 747, 749 (1925) (recognizing that offense of "assault and battery with intent to kill and murder" contained "all the elements of murder except the death of the party assailed"), overruled by State v. Foust , 325 S.C. 12, 479 S.E.2d 50 (1996). Yet, while the offenses of ABWIK and murder ultimately evolved into two discrete crimes, courts assigned conflicting mental states to each offense. See, e.g. , State v. Mouzon , 231 S.C. 655, 662, 99 S.E.2d 672, 675 (1957) (concluding evidence was sufficient to sustain conviction for murder although *24 there was "no actual intent to kill or injure another, there [was] evidence of such recklessness and wantonness as to indicate a depravity of mind and disregard of human life, from which a jury could infer malice"); State v. Hilton , 284 S.C. 245, 248, 325 S.E.2d 575, 576 (Ct. App. 1985) ("Assault and Battery with intent to kill requires a finding of a specific intent to kill."), overruled by State v. Foust , 325 S.C. 12, 479 S.E.2d 50 (1996) ; State v. Fennell , 340 S.C. 266, 531 S.E.2d 512 (2000) (affirming defendant's convictions for murder of intended victim and ABWIK of unintended victim; noting that the required mental state for ABWIK, like murder, is malice aforethought and concluding that ABWIK conviction was supported by the doctrine of transferred intent).
Not until this Court's decision in Foust was there any attempt at clarity. State v. Foust , 325 S.C. 12, 479 S.E.2d 50 (1996). In Foust , the Court was tasked with determining what level of intent is necessary to sustain a conviction for ABWIK. Id. Initially, the Court noted that "South Carolina caselaw on the requisite intent to commit [ABWIK] is ambiguous." Id . at 14, 479 S.E.2d at 51. The Court attributed this ambiguity to "the fact that [ABWIK] has been defined as the unlawful act of a violent nature to the person of another with malice aforethought, either express or implied." Id . As a result, the Court noted that "[a] number of cases since Jones have reiterated that [ABWIK] requires both an intent to kill and malice." Id. at 15, 479 S.E.2d at 51. While the Court acknowledged **59 that these "cases indicate that some intent must be demonstrated before an accused may be convicted of [ABWIK]," it did "not believe they stand for the proposition that a specific intent to kill must be shown." Id . Accordingly, the Court held that "it is sufficient if there is shown some general intent, such as that heretofore applied in cases of murder in this State." Id . The Court then instructed that "in charging juries the law of [ABWIK], South Carolina trial judges should give a standard 'intent' charge, but need not advise the jury that the defendant must have a specific intent to kill before he may be convicted of [ABWIK]." Id. at 16, 479 S.E.2d at 52 (footnote omitted).
In 2000, ten years prior to the statutory enactment of the crime of attempted murder, this Court declined to adopt the common law crime of attempted murder. State v. Sutton , 340 S.C. 393, 398-99, 532 S.E.2d 283, 286 (2000). In Sutton , the defendant was convicted of ABWIK, attempted murder, and possession of a firearm during the commission of a violent crime. Id . On appeal, the Court of Appeals vacated Sutton's attempted murder conviction and sentence, finding ABWIK and attempted murder are, in essence, the same offense. Id . at 395, 532 S.E.2d at 284. This Court affirmed as modified the decision of the Court of Appeals. Id . at 399, 532 S.E.2d at 286.
Citing Foust , this Court noted that "a specific intent is not required to commit [ABWIK]." Sutton, 340 S.C. at 396, 532 S.E.2d at 285. Premised on this principle, the Court distinguished the common law offense of attempted murder from the common law offense of ABWIK by concluding that attempted murder requires a specific intent to kill, while ABWIK does not require a specific intent. Id . at 397, 532 S.E.2d at 285 ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." (citation omitted)). Instead, the Court explained that ABWIK requires the same general intent as murder and is often described as follows: "if the victim had died from the injury, the defendant would have been guilty of murder." Id . at 396, 532 S.E.2d at 285. The Court concluded there was no need to adopt the common law offense of attempted murder because South Carolina's "common law offenses of [ABWIK] and [AWIK] (assault with intent to kill) adequately cover the **60 conduct which attempted murder would include." Id . at 398-99, 532 S.E.2d at 286.
While Sutton has continued to be cited, as evident by the Court of Appeals' decision in the instant case, the underlying basis for the Court's statement regarding attempted murder has never really been challenged. See, e.g. , State v. Wilds , 355 S.C. 269, 584 S.E.2d 138 (Ct. App. 2003) (citing Foust and Sutton , discussing express and implied malice, and concluding permissive inference of malice, which arose out of defendant's reckless use *25 of automobile, was sufficient to support ABWIK conviction).
In 2007, the Court of Appeals in State v. Kinard , 373 S.C. 500, 646 S.E.2d 168 (Ct. App. 2007), initiated a challenge by pointing out the inconsistencies in our state's case law regarding "malice aforethought." In Kinard , the defendant was convicted of first-degree burglary and ABWIK. Id. On appeal, Kinard, contended the trial judge erred in refusing to explicitly charge the jury on the general intent required to convict for ABWIK. Id. at 502, 646 S.E.2d at 168. The Court of Appeals disagreed, finding the judge's charge on "malice aforethought" was sufficient as it implicitly included the required mental state for ABWIK. Id. at 503, 646 S.E.2d at 169-70. In so ruling, the court recognized that "malice aforethought encompasses both the specific and general intent to commit murder." Id. at 504, 646 S.E.2d at 169. Thus, because ABWIK encompasses each of the required elements of murder except for the death of the victim, the court found that "it is axiomatic that malice aforethought be the mental state to commit [ABWIK]." Id .
However, despite this conclusion, the court recognized the confusion in our state's jurisprudence concerning the requisite mental state for murder and ABWIK. The court stated:
While we are mindful of previous opinions from the appellate courts of this state which have treated intent to kill and malice as separate requirements, we, much like both parties and the trial judge below, fail to discern any significant difference between general intent to kill and malice aforethought as they pertain to ABIK. Since the definition of malice aforethought encompasses general intent to kill, we find it difficult to reconcile a manner in which one could **61 find malice aforethought and yet not find general intent to kill. Further, we read the Foust opinion as the elimination of this artificial distinction. In stating that some general intent such as that heretofore applied in murder cases in this state was sufficient to prove ABIK, the Foust court was establishing malice aforethought as the necessary general intent. Since malice aforethought undoubtedly has been established as the intent required in murder cases, we necessarily arrive at the above conclusion. Moreover, our state Supreme Court reaffirmed malice aforethought as the required mental state for ABIK in an opinion decided four years subsequent to Foust . Fennell , 340 S.C. at 275, 531 S.E.2d at 517. Accordingly, we find the trial court's jury instruction, which properly charged the jury regarding malice aforethought, to be without error. The jury was given a proper "intent" charge.
Id . at 505, 646 S.E.2d at 170.
Kinard identifies what is missing from the Court of Appeals' analysis of section 16-3-29 of the South Carolina Code. Specifically, the Court of Appeals focused on the phrase "with intent to kill" in isolation and did not consider the remainder of the statute concerning "malice aforethought." Had the court done so, the decision would have been much clearer as to why attempted murder requires a specific intent to kill.
Additionally, it is necessary to address both parts of section 16-3-29 as it demonstrates that the General Assembly created the offense of attempted murder by purposefully adding the language "with intent to kill" to "malice aforethought, either express or implied" to require a higher level of mens rea for attempted murder than that of murder. Moreover, the addition of the "with intent to kill" language effectively negates the State's claim that the General Assembly merely codified ABWIK. Because our case law, particularly Foust , establishes "malice aforethought" as the required mental state for ABWIK, the additional language of "with intent to kill" clearly elevates the required mental state above a general-intent crime.[2]
**62 While we are convinced that this is the correct interpretation, we also acknowledge *26 the ambiguity created by the language in section 16-3-29 as aptly noted by the author of the concurring opinion. However, unlike the concurring opinion, we find the legislative history, when read in its entirety, supports our conclusion.[3]
Section 16-3-29 is part of the "Omnibus Crime Reduction and Sentencing Reform Act of 2010 (the "Act")," which was enacted in response to a report submitted to the General Assembly by the South Carolina Sentencing Reform Commission (the "Commission"). South Carolina Sentencing Reform Commission Report (Feb. 1, 2010).[4] This Commission was established by the General Assembly in 2008 to address the "[r]ising recidivism rates, increasing prison populations, limited sentencing alternatives and re-entry programs, and mounting correctional costs for both state and local governments." Id . at 1. In its report, the Commission offered numerous recommendations to address these issues. Of significant import, the Commission recommended that the General Assembly:
Enact legislation to restructure by statute the degrees of assault and battery, including the existing common law and statutory offenses, so that the common law offense of "Assault and Battery of a High and Aggravated Nature" is **63 abolished, and the statutory offense of "Assault and Battery with Intent to Kill" (Section 16-3-620), is repealed. In the legislation, establish graduated offenses of "Assault and Battery," to include "Attempted Murder," "Aggravated Assault and Battery," and "Assault and Battery," with commensurate penalties.
Id . at 21-22.
The General Assembly followed this recommendation as evident by the language in the Preamble to the Act. Specifically, the Preamble states that the Act: (1). adds section 16-3-29"so as to create the offense of attempted murder and provide a penalty"; (2). "create[s] various levels and degrees of assault and battery offenses"; (3). amends section 16-3-610, relating to assault with a concealed weapon, "so as to reference the new offenses of attempted murder and assault and battery"; (4). is enacted "to repeal sections 16-3-312, 16-3-620, 16-3-630, and 16-3-635 all dealing with various assault and battery offenses"; and (5). is enacted "to repeal certain common law assault and battery offenses." Act No. 273, 2010 S.C. Acts 1937 (emphasis added).
In turn, these directives were codified in sections 16-3-29 and 16-3-600. See State v. Middleton , 407 S.C. 312, 315, 755 S.E.2d 432, 434 (2014) ("Through the passage of the [Omnibus Crime Reduction and Sentencing Reform Act of 2010] the legislature abolished all common law assault and battery offenses and all prior statutory assault and battery offenses. In place of these offenses, the Act codifies attempted murder in section 16-3-29 and four degrees of assault and battery in section 16-3-600."). Notably, a person convicted of attempted murder faces a potential sentence of thirty years' imprisonment in contrast to the potential twenty-year sentence previously provided for ABWIK. S.C. Code Ann. § 16-3-29 (2015) (providing for offense and penalty of attempted murder); Id . at § 16-3-620 (2003) (identifying offense and penalty of ABWIK), repealed by Act No. 273, 2010 S.C. Acts 1937.
Considering the legislative history as a whole, we conclude that section 16-3-29 is not a codification of the offense of ABWIK. We find the General Assembly expressly repealed the offense of ABWIK and purposefully created the new offense of attempted murder, which includes a "specific intent **64 to *27 kill" as an element.[5] Accordingly, we agree with the Court of Appeals that the trial judge erred in charging the jury that a specific intent to kill is not an element of attempted murder. Further, we agree that this error cannot be deemed harmless.
B. Admissibility of Officer's Statements Regarding Investigation
The State argues the Court of Appeals erred in ruling Officer Butler's testimony regarding what she learned during her investigation of the crime scene constituted inadmissible hearsay. Contrary to the Court of Appeals' interpretation, the State asserts that State v. Kromah , 401 S.C. 340, 737 S.E.2d 490 (2013),[6] and State v. Weaver , 361 S.C. 73, 602 S.E.2d 786 (Ct. App. 2004), aff'd as modified by 374 S.C. 313, 649 S.E.2d 479 (2007),[7] **65 support the admission of Officer Butler's "limited testimony." Specifically, the State claims that Officer Butler's testimony, like that of the investigators in Kromah and Weaver , did not impermissibly repeat statements made by individuals she interviewed. Rather, her testimony merely relayed what she learned as part of her investigation of the crime scene.
Further, the State contends that, even if Officer Butler's testimony constituted inadmissible hearsay, any error in its admission was harmless beyond a reasonable doubt. Unlike the Court of Appeals, the State believes Officer Butler's testimony regarding multiple shots fired did not affect the jury's determination that King was guilty of attempted murder. According to the State, the Court of Appeals' conclusion was based on the incorrect assumption that "the only way the jury could find attempted murder was to believe multiple shots were fired." In contrast, the State asserts the undisputed testimony that King fired one shot inside the cab was sufficient for the jury to find King possessed the requisite intent to kill, including a specific intent to kill.
We agree with the Court of Appeals that the trial judge erred in admitting the testimony of Officer Butler. We find the Court of Appeals correctly distinguished Officer Butler's testimony from that found admissible in Kromah and Weaver . Further, we agree with the Court of Appeals that any error in the admission of the testimony would have only affected the jury's determination of the attempted murder charge. Additionally, like *28 the Court of Appeals, we conclude that the error, if combined with the erroneous attempted murder jury instruction, was not harmless as to the attempted murder charge. **66 However, despite our agreement with the ultimate conclusion of the Court of Appeals, we decline to rely on the supporting authority cited in the opinion. Specifically, the Georgia case cited by the Court of Appeals is now of questionable value as a state statute has been enacted to address this issue.[8] Moreover, the Eleventh Circuit case has since been abrogated.[9] Accordingly, given the subsequent history of these cases, we modify the Court of Appeals' analysis.
We find the disposition of this issue involves a straightforward hearsay analysis. "Hearsay is a statement, which may be written, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." State v. Brockmeyer , 406 S.C. 324, 351, 751 S.E.2d 645, 659 (2013) (quoting In re Care & Treatment of Harvey , 355 S.C. 53, 61, 584 S.E.2d 893, 897 (2003) ); Rule 801(c), SCRE. "Hearsay is not admissible unless there is an applicable exception." Brockmeyer , 406 S.C. at 351, 751 S.E.2d at 659 ; Rule 802, SCRE.
Here, as correctly recognized by the Court of Appeals, Officer Butler's testimony was hearsay as it was based exclusively on what the witnesses told her during the neighborhood canvas and was offered to prove that King fired more than one gunshot. Further, we do not discern, nor has the State cited, any exception to the hearsay rule that would provide for the admissibility of the testimony.
Nonetheless, even with this straightforward analysis, we believe it is necessary to caution prosecutors against using "investigative information" as it appears this is an attempt to **67 circumvent the rules against hearsay. See, e.g. , Lewis v. State , 80 So.3d 442, 444 (Fla. Dist. Ct. App. 2012) (concluding that investigating officer's testimony that he developed a suspect and, in turn, a photographic lineup, after speaking with two non-testifying witnesses constituted inadmissible hearsay; stating, "[w]here the implication from in-court testimony is that a non-testifying witness has made an out-of-court statement offered to prove the defendant's guilt, the testimony is not admissible" (citation omitted)); State v. Magee , 143 So.3d 532, 537 (La. Ct. App. 2014) ("The fact that an officer acted on information obtained from an informant may be relevant to explain his conduct, but may not be used as a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule ." (emphasis added)).
We are persuaded by the explanation offered by the Supreme Court of Kentucky. Ruiz v. Commonwealth , 471 S.W.3d 675 (Ky. 2015). In Ruiz , the court attempted to dispel any misconception that testimony from an investigating officer regarding the content of out-of-court statements was admissible. Specifically, the court explained:
An out-of-court statement made to a police officer is judged by the same rules of evidence that govern any out-of-court statement by any out-of-court declarant. If it is relevant and probative only to prove the truth of the matter asserted by the out-of-court declarant, then the statement is hearsay, and its admission into evidence is governed by the traditional hearsay rule. And, as any other statement, if the out-of-court statement made to a police officer has relevance and probative value that is not dependent upon its truthfulness, and it is not offered into evidence as proof of the matter asserted, then by definition the evidence is not hearsay.
* * *
*29 In such circumstances, because the out-of-court statement would not be subject to the hearsay rule, its admissibility would be determined by application of other rules of evidence. So-called "investigative hearsay" is still, fundamentally, hearsay. There is no special kind of evidence known as "investigative hearsay;" we have no rule of evidence called the "investigative hearsay rule." Use of the term imparts no **68 meaningful information to the analysis that is not otherwise supplied by the word "hearsay."
Ruiz , 471 S.W.3d at 680-82 (citations and footnote omitted).
Based on this reasoning, we caution against the use and admission of "investigative information." While it may be couched in terms of explaining an officer's conduct during an investigation, it may not be used to offer the substance of an out-of-court statement that would otherwise violate our state's rules against hearsay.
C. Admissibility of Detention Center Phone Call
King argues the Court of Appeals erred in summarily affirming the judge's decision permitting the State to publish to the jury a recording of a fifteen-minute phone call King made while incarcerated. Because the State's purpose in introducing the recording was to establish King's ownership of the cellphone number used to contact the cab company, King asserts this could have been accomplished by introducing detention center phone logs. Further, King maintains that any probative value of the recording was outweighed by the danger of unfair prejudice created by the recording, which contained a profanity-laced conversation between King and another individual that inferred King had been charged with prior crimes similar to those for which he was currently on trial.
For several reasons, we agree with King that the trial judge abused his discretion in admitting the recorded phone conversation. See State v. Pagan , 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006) ("The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." (citation omitted)).[10]
First, the judge adamantly refused to listen to the recording prior to publishing it to the jury. By failing to listen to the **69 recording or requiring the State to produce a transcription of the recording for his review, we find the judge abused his discretion. See State v. Smith , 276 S.C. 494, 498, 280 S.E.2d 200, 202 (1981) (stating that "[i]t is an equal abuse of discretion to refuse to exercise discretionary authority when it is warranted as it is to exercise the discretion improperly").
Second, without listening to the recording, the judge was unable to determine whether the probative value outweighed any unfair prejudice. See State v. Dial, 405 S.C. 247, 260, 746 S.E.2d 495, 502 (Ct. App. 2013) ("A trial [court's] decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances." (internal quotation marks omitted)); Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."). While the recording was relevant to the State establishing King's ownership of the cellphone that called the cab company, it was not the only evidence that could have served this purpose. Rather, the testimony of Sergeant Kevia Heyward, who was employed at the detention center, and the detention center call logs clearly established that King called this number sixty-three times in one month. Further, the State could have agreed to the request that it stipulate to King's ownership of the cellphone.
Third, the limited probative value of the recording was outweighed by the unfair prejudice *30 to King. The fifteen-minute recording is riddled with profanity, racial slurs, and impermissible references to King's prior bad acts. See State v. Cheeseboro , 346 S.C. 526, 547, 552 S.E.2d 300, 311 (2001) ("Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one.").
Taking all of these factors into consideration, we find the Court of Appeals erred in affirming the admission of the recording. However, we conclude that this error does not warrant reversal of all convictions as advocated by King. While this serves as another basis to reject the State's position that any error with respect to the attempted murder charge was harmless, it does not have the same significance for the charges of armed robbery and possession of a firearm during **70 the commission of a violent crime. See State v. Tapp , 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012) ("Engaging in this harmless error analysis, we note that our jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict.").
Because the recording is very difficult to understand, we question whether the jury in fact was influenced by it. In any event, it was not enough to affect the jury's determination of the armed robbery and related weapon charge as the emphasis of King's defense was focused on the requisite level of intent for attempted murder, in particular the conflict over the number of shots fired. Further, there was no real dispute over the charge of armed robbery as Brown positively identified King as the suspect and testified in detail that he gave King the "give away" money in response to King pointing the weapon at his head. Consequently, we conclude that the admission of the recording does not warrant reversal of King's convictions for armed robbery and possession of a firearm during the commission of a violent crime. See State v. Black , 400 S.C. 10, 16-17, 732 S.E.2d 880, 884 (2012) ("To warrant reversal, an error must result in prejudice to the appealing party.").
IV. Conclusion
In conclusion, we agree with the Court of Appeals' decision to affirm King's convictions for armed robbery and possession of a firearm during the commission of a violent crime and to reverse and remand King's conviction for attempted murder. Yet, we clarify that the offense of attempted murder, as codified in section 16-3-29 of the South Carolina Code and viewed in its entirety, requires a specific intent to kill. Further, we conclude, based on our state rules of evidence, that Officer Butler's testimony should not have been admitted as it constituted inadmissible hearsay regardless of the fact that it was offered by the State to explain Officer Butler's investigation. However, like the Court of Appeals, we find the admission of this testimony constituted harmless error. Finally, in contrast to the Court of Appeals, we hold that the trial judge erred in admitting the recording of King's detention center **71 phone call. Nevertheless, we conclude the admission of the recording constituted harmless error.
Accordingly, the decision of the Court of Appeals is
AFFIRMED AS MODIFIED.
Acting Justices DeAndrea Gist Benjamin and J. Mark Hayes, II, concur.
Acting Justice Costa M. Pleicones concurring in result only. KITTREDGE, J., concurring in a separate opinion.
JUSTICE KITTREDGE :
I concur in result. I write separately because I construe section 16-3-29 of the South Carolina Code[11] differently than the majority.
Before addressing the attempted murder statute, I note my complete agreement with the majority's analysis and conclusion concerning the error in the admission of the challenged portions of Officer Jennifer Butler's testimony. While the admission of this evidence was harmless as to the armed robbery *31 and firearm possession charges, the evidence was not harmless beyond a reasonable doubt as to the attempted murder charge. I similarly agree with the majority that the trial court abused its discretion in admitting the entirety of Raheem King's jail telephone call recording. Nevertheless, for the reasons persuasively advanced by the majority, I find the error in the admission of the telephone call recording harmless as to the armed robbery and weapon charges.
I turn now to what I view as the primary issue before the Court, for our construction of the attempted murder statute will have significant implications, at least until the legislature responds and clarifies the ambiguity in section 16-3-29. The question is easily stated-whether the section 16-3-29 offense of attempted murder is a specific intent crime-but not easily answered. I commend Chief Justice Beatty on a well-reasoned, scholarly opinion, but I respectfully reach a different conclusion.
**72 I do so on the basis that our singular focus is to determine the legislative intent expressed in section 16-3-29.
Section 16-3-29 provides that "[a] person who, with intent to kill , attempts to kill another person with malice aforethought, either expressed or implied , commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015) (emphasis added). For conduct to fall within the scope of the statute requires an "intent to kill," as well as malice aforethought, which may be "either expressed or implied." Id. Each of these phrases on its own is clear, but when they are combined, the intent of the legislature is not.
The majority and I agree that the statutory language creates an ambiguity-"with intent to kill" speaks to a specific intent crime while "malice aforethought, either expressed or implied" points to a general intent crime. I would resort to legislative history to resolve the tension between the two phrases. At this point, however, the majority "expand[s] on the analysis" and reviews the majority rule that attempt crimes generally require a specific intent. We are further presented with case law from other jurisdictions that follow the general rule. But as I see it, our sole task is to discern what the South Carolina General Assembly intended in section 16-3-29.[12]
South Carolina's common law offense of "assault and battery with intent to kill" (ABWIK) does not follow the general rule discussed by the majority. For many years, there was confusion as to the intent requirement in the offense of ABWIK. In 1996, this Court definitively answered the question and held the common law offense of ABWIK requires only a showing of general intent, as encompassed by the requirement of "malice aforethought, either express or implied." State v. Foust , 325 S.C. 12, 14-15, 479 S.E.2d 50, 51 (1996) ("As this Court has recognized that a specific intent is not required to commit murder, the logical inference is that, likewise, a specific intent is not required to commit [ABWIK]." (footnote omitted)).
**73 Thereafter, in 2010, the legislature repealed the common law offense of ABWIK and replaced it with the statutory offense of attempted murder in section 16-3-29. As a matter of statutory construction, we are to presume the legislature knew the law on ABWIK when it repealed the common law offense and replaced it with the attempted murder statute. See, e.g. , Grier v. Amisub of S.C., Inc. , 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012) ("In ascertaining the meaning of language used in a statute, we presume the General Assembly is 'aware of the common law, and where a statute uses a term that has a well-recognized meaning in the law, the presumption is that the General Assembly intended to use the term in that sense.' " (quoting State v. Bridgers , 329 S.C. 11, 14, 495 S.E.2d 196, 198 (1997) )). If ever there was any doubt as to the legislature's intent, the act that created section 16-3-29 surely removed it, stating that, with two exceptions not applicable here, "wherever in the 1976 Code [of Laws] reference is made to assault and battery with intent to kill, it means attempted murder as defined in Section 16-3-29." Act No. 273, § 7.C, 2010 S.C. Acts 1937, 1950.
*32 At this point in my analysis, I conclude that section 16-3-29 represents the codification of the common law offense of ABWIK. In this regard, I am persuaded by the legislature's use of the verbatim definition of ABWIK in the section 16-3-29 offense of attempted murder. I resolve the ambiguity in the "with intent to kill" language and the seemingly contradictory "with malice aforethought, either expressed or implied" language by resorting to our case law defining the elements of ABWIK, especially the requisite level of intent. We know from Foust that "it is sufficient if there is shown some general intent, such as that heretofore applied in cases of murder in this State." Foust , 325 S.C. at 15, 479 S.E.2d at 51. If the legislature intended to create a specific intent crime, why did it use verbatim the language of the repealed common law offense of ABWIK that had a settled understanding as a general intent crime? I would therefore conclude that a specific intent to kill is not an element of the offense of attempted murder found in section 16-3-29, notwithstanding that the phrase "with intent to kill" is included in the statute. Similarly, I know with certainty that a specific intent to kill is not an element of ABWIK, although the phrase "with intent to kill" is **74 included in the name of the common law crime. For these reasons, I would affirm the trial court's finding and related jury instruction that "[a] specific intent to kill is not an element of attempted murder but it must be a general intent to commit serious bodily harm."[13] State v. King , 412 S.C. 403, 407, 772 S.E.2d 189, 191 (Ct. App. 2015). While the majority's analysis of the general law concerning attempt and specific intent is enlightening, I respectfully do not believe it reflects our legislature's intent in enacting section 16-3-29-and here, that's the only intent that matters.
Because my view of the evidentiary challenges is in line with the majority, I concur in the remand for a new trial on the attempted murder charge. Accordingly, I concur in result.

The offense of attempted murder, as codified in section 16-3-29 of the South Carolina Code, is defined as follows: "[a] person who, with intent to kill , attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015) (emphasis added).

We note that our interpretation of section 16-3-29 is consistent with other attempt statutes that require a "specific intent." See, e.g. , S.C. Code Ann. § 25-1-2895 (2007) (defining "attempts" in Military Code as "An act, done with specific intent to commit an offense under this code, amounting to more than mere preparation and tending even though failing to effect its commission, is an attempt to commit that offense.").

In support of its position, the concurring opinion references a single provision of the legislative history. See Act No. 273, § 7.C, 2010 S.C. Acts 1937, 1950 (stating, in relevant part, that "whenever in the 1976 Code [of Laws] reference is made to assault and battery with intent to kill, it means attempted murder as defined in Section 16-3-29"). We believe the concurring opinion misconstrues this phrase. Like the Court of Appeals, we find "the Legislature included the statement '[ABWIK] ... means attempted murder' to avoid any confusion as to how the new crime of attempted murder affects the operation of other statutes that contain the phrase 'assault and battery with intent to kill'." King , 412 S.C. at 411, 772 S.E.2d at 193.

This Report may be found at:
http://www.scstatehouse.gov/Archives/CitizensInterestPage/SentencingReformCommission/CombinedFinalReport020110SigPage.pdf.

In an argument related to the State's attempted murder charge issue, King posits, as an additional sustaining ground, the Court of Appeals erred in summarily affirming the trial judge's decision to instruct the jury that malice may be inferred from the use of deadly weapon. Because we affirm the decision of the Court of Appeals regarding the requisite mens rea for attempted murder, we decline to address King's additional sustaining ground. See I'On, L.L.C. v. Town of Mt. Pleasant , 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) (citing Rule 220(c), SCACR and stating, "The appellate court may review respondent's additional reasons and, if convinced it is proper and fair to do so, rely on them or any other reason appearing in the record to affirm the lower court's judgment" (emphasis added)).
While we find it unnecessary to address King's additional sustaining ground, we would respectfully suggest to the General Assembly to re-evaluate the language following "malice aforethought" as the inclusion of the word "implied" in section 16-3-29 is arguably inconsistent with a specific-intent crime. See Keys v. State , 104 Nev. 736, 766 P.2d 270, 273 (1988) (stating, "[o]ne cannot attempt to kill another with implied malice because there is no such criminal offense as an attempt to achieve an unintended result" (citation and internal quotation marks omitted)). Moreover, if there is no evidence that one charged with attempted murder had express malice and a specific intent to kill, we believe the crime would involve a lower level of intent and, thus, would fall within the lesser degrees of the assault and battery offenses codified in section 16-3-600. See S.C. Code Ann. § 16-3-600 (2015 & Supp. 2016) (identifying levels and degrees of assault and battery offenses).

See State v. Kromah , 401 S.C. 340, 737 S.E.2d 490 (2013) (concluding that investigator's testimony about actions he took after conversations he had with three-year-old victim was admissible as the investigator did not directly relate to the jury any statements made by the child and the defense had an opportunity to cross-examine the investigator).

See State v. Weaver , 361 S.C. 73, 602 S.E.2d 786 (Ct. App. 2004) (holding that investigator's statement that "all of the evidence led to" or pointed to defendant did not constitute inadmissible hearsay given the investigator never repeated statements made to him by individuals at the crime scene and the testimony was in response to questions asked on cross-examination), aff'd as modified by 374 S.C. 313, 649 S.E.2d 479 (2007) (affirming but modifying Court of Appeals' analysis that police had probable cause for warrantless search of defendant's vehicle).

The Court of Appeals noted that Weems v. State , 269 Ga. 577, 501 S.E.2d 806 (1998) was decided under a former provision of the Georgia Code. King , 412 S.C. at 414 n.2, 772 S.E.2d at 195 n.2. However, in 2013, the Georgia legislature substantially revised the state's rules of evidence. See Parker v. State , 296 Ga. 586, 769 S.E.2d 329 (2015) (recognizing that Georgia's new Evidence Code took effect on January 1, 2013).

United States v. Baker , 432 F.3d 1189 (11th Cir. 2005), abrogated in part by Davis v. Washington , 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (concluding that victim's statements, during 911 phone call "interrogation," identifying her assailant were non-testimonial under Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ).

We reject the State's contention that King waived this issue because he declined the trial judge's offer to redact the recording prior to publication to the jury. King presented an "all or nothing" objection to the recording as it would have been futile to redact the objectionable language and content from the recording. Had a redaction been possible, the recording would have been of no value to the State.

"A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015).

Because the heart of this case lies at the intersection of legislative and criminal intent in South Carolina , in my view, decisions of other states' courts interpreting their own particular laws are of little help.

For the same reasons, I would affirm the trial court's "permissive inference of malice from the use of a deadly weapon" instruction, an issue the majority does not reach. See State v. King , 412 S.C. 403, 418, 772 S.E.2d 189, 197 (Ct. App. 2015). Given that I am in the minority in believing that the attempted murder statute requires only a general intent, I would caution against any implied malice instruction in a future prosecution under section 16-3-29. For the reasons pointed out by the majority, it seems to me that the concept of implied malice has no place in a prosecution for a specific intent crime. The majority has wisely suggested that the General Assembly reevaluate the implied malice language in the statute in light of the Court's holding that attempted murder requires a specific intent to kill. The necessity of legislative action, of course, depends on the legislature's acceptance or rejection of this Court's determination of legislative intent.